## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
------------------------------------------------:
FERNANDO COZZA                                  :
2969 Windy Bush Road                            :
Newtown, PA  18940                              :
            and                                 :
PLAZA PROPERTY GROUP LLC                        :
221 Bolivar Street                              :
Jefferson City, MO  65101                       :
            and                                 :
KANSAS CITY EQUITIES LLC                        :
221 Bolivar Street                              :
Jefferson City, MO  65101                       :
                                                :
            v.                                  : NO.
                                                :
NICKOLAS W. JEKOGIAN, III                       :
171 E. 84th St, Apt. 28e                        :
New York, NY  10028                             :
            and                                 :
NICK'S PROPERTIES, LLC                          :
221 Bolivar Street                              :
Jefferson City, MO 65101                        :
            and                                 :
NWJ KANSAS CITY, INC.                           :
c/o Nickolas W. Jekogian, III                   :
171 E. 84th St, Apt. 28e                        :
New York, NY  10028                             :
------------------------------------------------:
```

## COMPLAINT

### Parties

1.      Plaintiff Fernando Cozza is an adult individual and a resident of 2969 Windy

Bush Road, Newtown, PA 18940.

2.      Plaintiff Plaza Property Group, LLC is a Missouri limited liability company with

a registered address of 221 Bolivar Street, Jefferson City, MO 65101.

3.      Plaintiff Kansas City Equities, LLC is a Missouri limited liability company with an address of 221 Bolivar Street, Jefferson City, MO 65101.

4.      Defendant Nickolas W. Jekogian, III, is an adult individual with an address of 1430 Broadway, Suite 503, New York, NY 10018.Defendant Nick's Properties, LLC is a Missouri limited liability company with an address of 221 Bolivar Street, Jefferson City, MO 65101.

5.      Defendant Nicks Properties, LLC is a Missouri limited liability company with an address of 221 Bolivar Street, Jefferson City, MO 65101.

6.      Defendant NWJ Kansas City, Inc. ("NJWKC") was a Missouri Corporation solely owned by defendant Jekogian until its charter was revoked in 2006

### Jurisdiction

7.      Jurisdiction is proper pursuant to 28 U.S.C. §1332.

### Facts

8.      Plaintiff Cozza, Defendant Jekogian, and Plaintiff's brother, Luis Cozza (collectively "the Members") invested funds in the acquisition of several residential rental properties in and around the Kansas City area.

9.      On or about October 29, 2002, the Members formed a limited liability company known as Kansas City Equities, LLC ("KCE").

10.     A true and correct copy of the Articles of Organization and Certificate of Organization for KCE are attached hereto as Exhibit 1.

11.     On or about December 13, 2002, the Members executed a written Operating Agreement for KCE.

12.     A true and correct copy of the Operating Agreement is attached hereto as Exhibit 2.

13.     On or about June 2, 2003, the Members formed a limited liability company known as Plaza Property Group, LLC ("PPG").

14.     A true and correct copy of the Articles of Organization and Certificate of Organization for PPG are attached hereto as Exhibit 3.

15.     On or about October 3, 2003, the Members executed a written Operating Agreement for PPG.

16.     A true and correct copy of the PPG Operating Agreement is attached hereto as Exhibit 4.

17.     The principal office of KCE was Defendant Jekogian's office, which at the time of formation was located at 1420 Walnut Street in Philadelphia.

18.     The principal office of PPG was Defendant Jekogian's office, which at the time of formation was located at 1600 Market Street, Suite 1410 in Philadelphia

19.     Jekogian has since moved the principal offices of KCE and PPG to Jekogian's new office in New York City.

20.     Plaintiff Cozza, Defendant Jekogian and Luis Cozza each owned one-third of KCE upon its formation.

21.     Plaintiff and Luis Cozza each owned 40.6% of PPG while Defendant Jekogian owns 18.8% upon its formation.

22.     PPG owns or owned approximately 82% of various properties around Kansas City and the other 18% is owned by Nicks Properties, LLC which is solely owned and controlled by Defendant Jekogian.

23.     Originally, the KCE and PPG Operating Agreements provide that Luis Cozza was a co-managing member with Defendant Jekogian.

24.     On October 14, 2005, NWJKC was formed by Jekogian to serve as the sole managing member of PPG and KCE.

25.     A true and correct copy of the Articles of Incorporation and Certificate of Incorporation for NWJKC are attached hereto as Exhibit 5

26.     Jekogian is the President, CEO and sole shareholder of NWJKC.

27.     On October 20, 2005, the Members executed an Assignment and Assumption of Membership Interests to transfer 1/3 of 1 percent of each of their shares of KCE to NWJKC so that NWJKC became a 1% member of KCE.

28.     A true and correct copy of the KCE Assignment and Assumption is attached hereto as Exhibit 6.

29.     On October 20, 2005, the Members amended the KCE Operating Agreement to appoint NWJKC as the Managing Member of KCE.

30.     A true and correct copy of the KCE First Amendment to Operating Agreement is attached hereto as Exhibit 7

31.     On October 20, 2005, the Members executed an Assignment and Assumption of Membership Interests to transfer 1/3 of 1 percent of each of their shares of PPG to NWJKC so that NWJKC became a 1% member of PPG.

32.     A true and correct copy of the PPG Assignment and Assumption is attached hereto as Exhibit 8.

33.     On October 20, 2005, the Members amended the PPG Operating Agreement to admit NWJKC as a 1% member and appoint NWJKC as the Managing Member of PPG.

34.     A true and correct copy of the KCE First Amendment to Operating Agreement is attached hereto as Exhibit 9

35.     Since NWJKC took over the position of managing member, Jekogian has excluded Plaintiff from participation in the management of KCE and PPG.

36.     NWJKC has since had its charter revoked for failure to file proper filings with the Missouri Secretary of State.

37.     Despite demand, Defendant Jekogian and has refused to provide information to Plaintiff about the management and finances of KCE and PPG.

38.     The financial information that Plaintiff has been able to obtain independently indicates that large sums of money have been transferred from KCE and PPG to Jekogian's personal accounts or other depository accounts controlled by and for the benefit of Jekogian and not KCE or PPG.

39.     Upon information and belief, Jekogian has embezzled funds properly belonging to KCE and PPG and distributable in equal shares to all members for his personal benefit.

40.     Under Jekogian's direction, K-1s were issued annually to Plaintiff indicating that Plaintiff had received gains on his membership interests.

41.     Plaintiff, however, has not received any corresponding distributions.

### Count I-Breach of Fiduciary Duty

### Plaintiff Cozza, individually and on behalf of Plaintiffs KCE and PPG v. Jekogian

42. Plaintiff hereby incorporates Paragraphs 1 through 41 as if set forth at length herein.

43. Defendant Jekogian owe fiduciary duties to KCE, PPG and Cozza by virtue of his position as co-member, managing member and president of nominal managing member NWJKC of KCE and PPG.

44. Defendant Jekogian has committed misconduct in his role as co-member and managing member of KCE and PPG by, among other things, failing to act in good faith, failing to exercise his duty of loyalty, and engaging in self-dealing transactions.

45. Defendant Jekogian has dominated control of the company affairs and acted solely in his own self-interest.

46. Jekogian has controlled the affairs of KCE and PPG in a manner that is contrary to the interests of Plaintiff's.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendant Jekogian for actual damages, costs and interest in an amount exceeding $75,000.

## Count II-Breach of Contract

### Plaintiff Cozza, individually and on behalf of Plaintiffs KCE and PPG v. Jekogian

47. Plaintiff hereby incorporates Paragraphs 1 through 30 as if set forth at length herein.

48. Defendant Jekogian is a member of Kansas City Equities, LLC as indicated in the Operating Agreement attached hereto as Exhibit A ("the KCE Contract").

49. Jekogian is, de facto, the sole managing member of KCE and PPG by, among other things, his position of President and CEO of defunct managing member NWJKC.

50. Article 7 of the Contract requires the Net Profits to be allocated in accordance with the member's respective membership interest.

51. The members are each one-third owners of KCE and PPG.

52. Article 8 of the KCE and PPG Operating Agreements require that the Net Cash available for distribution be distributed in accordance with the member's respective membership interest.

53. Defendant Jekogian has retained net profits and net cash receipts available for
distribution for himself and contrary to the requirements of the Contract.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter
judgment in its favor and against Defendant Jekogian for actual damages, costs and interest in an
amount exceeding $75,000.

### Count III-Fraudulent Conveyance

### Plaintiff Cozza, individually and on behalf of Plaintiffs KCE and PPG v. Jekogian

54. Plaintiff hereby incorporates Paragraphs 1 through 37 as if set forth at length herein.

55. Upon information and belief, Defendant Jekogian fraudulently transferred monies
belonging to Plaintiffs by transferring the monies

   a. to a spouse, close relatives, trusts, or other entities set up for his or his family's
   benefit

   b. without receiving adequate consideration in return;

   c. under circumstances that differ from the usual method of transacting business;

   d. in anticipation of suit or execution and to conceal the assets from Plaintiffs;

   e. while retaining possession and control of the assets; and

   f. rendering Plaintiff's KCE and PPG insolvent.

56. Plaintiffs have been damaged as a result of Plaintiff's fraudulent transfers

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter
judgment in its favor and against Defendant Jekogian for actual damages, punitive damages,
costs and interest in an amount exceeding $75,000.

## Count IV-Shareholder Oppression

### Plaintiff Cozza, individually and on behalf of Plaintiffs KCE and PPG v. Jekogian

57. Plaintiff hereby incorporates Paragraphs 1 through 40 as if set forth at length herein.

58. Jekogian has engaged in harsh, burdensome, dishonest, and self-dealing wrongful conduct toward Plaintiffs.

59. Jekogian's conduct toward Plaintiffs represents a visible departure from the standards of fair dealing.

60. Defendant Jekogian has wrongfully exercised his authority or power over KCE and PPG.

61. Defendant Jekogian has wrongfully excluded Plaintiffs from their fair share of the benefits of KCE and PPG.

62. Defendant Jekogian has wrongfully excluded Plaintiff from engaging in participation in the management of KCE and PPG.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendant Jekogian for actual damages, punitive damages, costs and interest in an amount exceeding $75,000.

## Count V-Accounting

### Plaintiff Cozza, individually and on behalf of Plaintiffs KCE and PPG v. Jekogian

63. Plaintiff hereby incorporates Paragraphs 1 through 46 as if set forth at length herein.

64. Plaintiff Cozza as a co-member of KCE and PPG is entitled to an accounting from Defendant Jekogian for the financial revenues and expenses of KCE and PPG.

65. As a co-member and de facto Managing Member of KCE and PPG, Jekogian has a fiduciary duty to Plaintiff to account for the revenues and expenses of KCE and PPG.

66. Plaintiff needs discovery to determine where all the money has been

67. Defendants owe Plaintiff a fiduciary duty.

68. Defendant has acted fraudulently or made misrepresentations regarding the financial status of KCE.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in its favor and against Defendant Jekogian for a full and complete accounting of all transactions and financial affairs of KCE and PPG.

<u>**Count VI-Shareholder Access to Records**</u>

<u>**Plaintiff Cozza, individually and on behalf of Plaintiffs KCE and PPG v. Jekogian**</u>

69. Plaintiff hereby incorporates Paragraphs 1 through 48 as if set forth at length herein.

70. Plaintiff Cozza as a co-member of KCE and PPG is entitled to inspect the books and records of KCE and PPG.

71. On November 5, 2014 and November 7, 2014 Plaintiff made written demands on Jekogian pursuant to Missouri Limited Liability Company Act for an inspection of the books and records of PPG and KCE.

72. A true and correct copy of Plaintiff's demand for inspection of the books and records of PPG is attached hereto as Exhibit 10.

73. A true and correct copy of Plaintiff's demand for inspection of the books and records of KCE is attached hereto as Exhibit 11.

74. Jekogian ignored Plaintiff's demand in violation of the Missouri Limited Liability Company Act.

75. Defendant Jekogian has failed and refused to allow Plaintiff to inspect he books and records.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in its favor and against Defendant Jekogian directing Defendant Jekogian to provide full and complete access to the books and records of PPG and KCE.

LUNDY, BELDECOS & MILBY, P.C.

Date: 1-28-15

By: _Eric C. Milby_

ERIC C. MILBY, Esquire
Attorney for Plaintiff

# EXHIBIT "1"



**State of Missouri**

**Matt Blunt, Secretary of State**

Corporations Division
P.O. Box 778, Jefferson City, MO 65102

James C. Kirkpatrick State Information Center
600 W. Main Street, Rm 322, Jefferson City, MO 65101

## Articles of Organization
*(Submit in duplicate with filing fee of $105)*

1. The name of the limited liability company is:

   Kansas City Equities L.L.C
   *(Must include "Limited Liability Company," "Limited Company," "LC," "L.C.," "L.L.C.," or "LLC")*

2. The purpose(s) for which the limited liability company is organized:   Real Estate Ownership

3. The name and address of the limited liability company's registered agent in Missouri is:

   Kristy Phillips- 106 W. 11th St. Ste 180, Kansas City, MO 64105
   *Name*                    *Street Address:  May not use P.O. Box unless street address also provided*          *City/State/Zip*

4. The management of the limited liability company is vested in one or more managers.   [x] Yes   [ ] No

5. The events, if any, on which the limited liability company is to dissolve or the number of years the limited liability company is to continue, which may be any number or perpetual: _____

   Perpetual
   *(The answer to this question could cause possible tax consequences, you may wish to consult with your attorney or accountant)*

6. The name(s) and street address(es) of each organizer (Post Office box alone not acceptable):

   Fernando Cozza- 1420 Walnut St. Ste 650, Philadelphia, PA 19102

7. For tax purposes, is the limited liability company considered a corporation?   [x] Yes   [ ] No

8. The effective date of this document is the date it is filed by the Secretary of State of Missouri, unless you

   indicate a future date, as follows: _____
   *(Date may not be more than 90 days after the filing date in this office)*

**In Affirmation thereof, the facts stated above are true:**

| | | |
|---|---|---|
| *(Organizer Signature)* | FERNANDO COZZA *(Printed Name)* | 10/29/02 *(Date)* |
| *(Organizer Signature)* | *(Printed Name)* | *(Date)* |
| *(Organizer Signature)* | *(Printed Name)* | *(Date)* |

FILED

NOV 0 4 2002

SECRETARY OF STATE

LLC-1 (11/00)

No. LC0073057

# STATE OF MISSOURI



## Matt Blunt
## Secretary of State

CERTIFICATE OF ORGANIZATION

LIMITED LIABILITY COMPANY

WHEREAS,

KANSAS CITY EQUITIES L.L.C.

filed its ARTICLES OF ORGANIZATION with this office on the
4th day of NOVEMBER, 2002, and that filing was found to
conform to the Missouri Limited Liability Company Act;

NOW, THEREFORE, I, MATT BLUNT, Secretary of State of the
State of Missouri, by virtue of authority vested in me by law,
do certify and declare that on the  4th day of NOVEMBER, 2002,
the above entity is a Limited Liability Company, organized in
this state and entitled to any rights granted to Limited
Liability Companies.

IN TESTIMONY WHEREOF,  I have set my
hand and imprinted the GREAT SEAL of
the State of Missouri,  on this, the
4th day of NOVEMBER, 2002.



_____
Secretary of State

$105.00

SOS #30 (1-01)

# EXHIBIT "2"

OPERATING AGREEMENT

OF

KANSAS CITY EQUITIES, LLC

Kansas City, Missouri

AGREEMENT made this 13th day of December, 2002, by and between Nickolas W. Jekogian, III and Luis A. Cozza and Fernando Cozza sometimes being referred to herein individually as "**Member**" and collectively as "**Members**".

**WITNESSETH:**

WHEREAS, the parties hereto desire to form a Limited Liability Company pursuant to the laws of the State of Missouri for the purpose and upon the terms and conditions hereinafter set forth.

**SECTION 1. FORMATION**

(1.1)   The parties agree to form a Limited Liability Company (the "**Company**") under the State of Missouri Limited Liability Company Act ("**Act**").

(1.2)   In connection with the execution of this Operating Agreement, the Members shall cause a Certificate of Organization that complies with the requirements of the Act to be properly filed with the Superintendent of Corporations of the District of Columbia, and shall execute such further documents (including amendments to the Certificate of Organization) and take such further action as is appropriate to comply with the requirements of the law for the formation or operation of a limited liability company in all states and counties where the Company may conduct its business.

(1.3)   The parties shall cause to be filed with the appropriate office in each jurisdiction in which the Company conducts business all certificates required by the Fictitious Name Act or Assumed Name Act or any similar statute in effect in each such jurisdiction.

(1.4)   The business of the Company shall be conducted under the name KANSAS CITY EQUITIES, LLC.

(1.5)   The location of the registered office of the Company shall be 106 W. 11th St. Ste 180 Kansas City, MO 64105 and thereafter at such location as the Managing Member may designate. The Company's registered agent shall be Kristy Phillips with an address of 106 W. 11th St. Ste 180 Kansas City, MO 64105.

(1.6)   The principal office of the Company shall be maintained at 1420 Walnut Street – Suite 650, Philadelphia, PA 19102, or at such other place(s) as the Managing Member may from time-to-time determine.

## SECTION 2. MEMBERS

(2.1)   The Members shall be Nickolas W. Jekogian, III and Luis A. Cozza and Fernando Cozza. Luis A. Cozza and Nickolas W. Jekogian III shall be "Managing Member."  Should either party cease, for any reason, to be the Managing Member, then Fernando Cozza shall be Managing Member.

(2.2)   Each Member's percentage interest in the Company's capital and income (the **"Company Interest"**) shall be as set forth below:

| Name | Interest |
|------|----------|
| Nickolas W. Jekogian, III | 33.33 % |
| Luis A. Cozza | 33.33 % |
| Fernando Cozza | 33.33% |

(2.3)   Whenever any voting is to take place under this Operating Agreement, each Member shall have the number of votes equal to such Member's Company Interest.

## SECTION 3. PURPOSE OF THE COMPANY

(3.1)   The purpose of the Company shall be real estate investment.

(3.2)   In addition to the purpose set forth in Section 3.1, the Company may also transact any and all businesses, which a limited liability company may transact under the Act.

## SECTION 4. TERM

(4.1)   Unless sooner dissolved by operation of law or as provided by this Agreement, the term of this Company shall commence on the date first written above and shall continue until December 5, 2031; unless sooner dissolved by:

a)    The affirmative vote of Members whose Company Interest equals more than 60% of all of the Company Interest;

b)    The sale, expiration, abandonment or other disposition of substantially all of the Company assets;

c)    Dissolution of the Company by judicial decree or operation by law;

d)    Any event which makes it unlawful for the business of the Company to be carried on by the Members;

2

e)    The death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company; or

f)    Any other event causing a dissolution of a limited liability company under the Act.

(4.2)   Notwithstanding the foregoing provisions of Section 4.1 upon the occurrence of an event described in Section 4.1 (e), if there are at least two remaining Members, the remaining Members have the right to continue the business of the Company.  Such right can be exercised only by the affirmative unanimous vote of the remaining Members within 90 days after the occurrence of an event described in Section 4.1 (e), to continue the business of the Company.  If not so exercised, the right of the Members to continue the business of the Company shall expire and the Company's affairs shall be wound up as provided in Section 13.

## SECTION 5. CAPITAL CONTRIBUTION OF MEMBERS

(5.1)   Each Member, upon execution of this Agreement, shall contribute to the Company, as such Member's initial capital contribution, the sum set forth to his name as follows:

| Name | Capital Contribution |
|---|---|
| Nickolas W. Jekogian, III | $333.33 |
| Luis A. Cozza | $333.33 |
| Fernando Cozza | $333.33 |

(5.2)   An individual capital account shall be maintained for each Member.  The capital account shall reflect each Member's initial contribution to the Company at its fair market value.

(5.3)   The Capital Account of the Members shall be maintained in accordance with Internal Revenue Reg. 1.704-1(b)(2)(iv) as in effect on the date hereof or as amended in the future.  Each Member's capital account shall be increased by (I) the amount of money contributed by such Member to the Company; (ii) the fair market value of property contributed by such member of the Company (net of liabilities secured by such property that the Company is considered to be assumed or take subject to under Internal Revenue Code Section 752); and (iii) allocations to such Member of Company income and gain including income and gain exempt from tax and income and gain described in Treas. Reg. 1.704-1(b)(iv)(g), and shall be reduced by (iv) the amount of money distributed to such Member by the Company; (v) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such property that such Member is considered to assume or take subject to under Internal Revenue Code Section 752); (vi) allocations to such Member of expenditures of the Company described

3

in Internal Revenue Code 705(a)(2)(B) (relating to expenditures which are neither deductible nor properly chargeable to capital); and (vii) allocations to such Member of Company loss and deduction, or item thereof, (including loss and deduction described in Treas. Reg. 1.704-1(b)(2)(iv)(g)).

(5.4)   Prior to debiting a Member's capital account to reflect a distribution of property to such Member as provided in clause (v) of Section 5.3 above, the capital accounts of all Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in such property (that has not been previously reflected in the capital accounts) would be allocated among the Members under this Section, as appropriate if such property were disposed of in a taxable transaction for its fair market value on the date of the distribution of such property to such Member.

(5.5)   If the time for determining that capital account of a Member is not the close for the Company accounting year, such Member's distributive share of any Company item listed in Section 5.3 above shall be for the period from the close of the last such Company accounting year to such date.

(5.6)   No interest shall be paid by the Company with respect to the capital accounts.

(5.7)   No Member shall withdraw any part of his capital account without the consent of the majority in interest of the Members.

## SECTION 6. LOANS

(6.1)   **Loans by Members.**  Any Member may, but shall not be obligated to, loan money to the Company.  The amount of any such loan shall not be deemed an increase in the Capital Account of the Member making such loan to the Company  or a contribution to the capital of the Company, nor shall it entitle such Member to an increase in such Member's share of the distributions of the Company.  The amount of any such loan and interest thereon shall be fixed by agreement of all members, but in no event shall such interest exceed the maximum rate allowed by law or be less than the then present applicable federal rate published by the Internal Revenue Service.  The loan shall be deemed an obligation of indebtedness from the Company to the Member making such loan and shall be payable out of the Cash Flow of the Company before any distributions to Members, or if earlier, upon dissolution of the Company, or upon such other terms as may be agreed upon.

## SECTION 7. PROFITS AND LOSSES

(7.1)   The term "Profits and Losses" shall refer to the income or loss of the Company for Federal Income Tax purpose determined as of the close of the Company's

4

fiscal year, taking into account federal tax items such as capital gain or loss, tax preference items, credits and depreciation recapture.

(7.2)   The net profits and losses of the Company for each calendar year shall be allocated in accordance with each Member's Company Interest;

(7.3)   Notwithstanding Section (7.2), gain or loss with respect to property contributed to the Company by a Member shall be allocated to the Member who contributed the property so as to take into account the difference, if any, between the tax basis of the property to the Company and its fair market value at the time of contribution to the Company pursuant to Internal Revenue Code Section 704(c) and the Treasury Regulations thereunder.

(7.4)   If requested by any Member, the Company, to the extent permitted by law, shall make an election under Section 754 of the Internal Revenue with respect to the transfer by sale or exchange of the Company Interest of any Member.

## SECTION 8. DISTRIBUTIONS

(8.1)   The term "**net cash receipts available for distribution**" as used herein shall mean all cash receipts from operations with respect to a taxable year less all cash disbursements, including expenditures for (I) capital improvements, (ii) principal and interest payments on mortgages and other indebtedness of the Company, (iii) cash expenditures incurred incident to the operation of the Company's business, including all salaries paid pursuant to this Agreement, and (iv) such cash reserves as the Managing Member deems reasonably necessary for the proper operation of the Company business.

(8.2)   The net cash receipts available for distribution shall be distributed from time-to-time as the Managing Member, or by unanimous agreement of all members, deems appropriate, to the Member in accordance with their respective Company Interest as set forth in Section 2.2.

## SECTION 9. PURCHASE OPTION OF THE COMPANY

(9.1)   Upon the filing of a bankruptcy petition by any Member of the filing of any bankruptcy action against any Member by his creditors which is not dismissed within sixty (60) days, or an attachment or levy upon the Company Interest of any Member, or an order being entered by a court of competent jurisdiction requiring a Member to transfer his Company Interest, or any involuntary transfer by a Member of his Company Interest, should the remaining Members elect to continue the business of the Company, the Member (or his legal representative) (the "Seller Member") shall give written notice to the Company of such event and shall be deemed to have offered to sell his Company Interest to the Company.  The Company shall have the option to then purchase all of the Selling Member's Company Interest in the Company.  Should the majority in interest of the Members (exclusive of the Member with respect to whose Company Interest the option is

5

then applicable) desire to have the Company purchase such Company Interest, then the Company shall give written notice of the exercise of its option to the Selling Member within thirty (30) days of the receipt of the Selling Member's notice.

(9.2)    The purchase price for such Company Interest shall be computed as of the last day of the fiscal quarter immediately preceding the date of the Selling Member's notice and the price and terms shall be in accordance with the provisions of Section 12 below.

## SECTION 10. DEATH OF A MEMBER

(10.1)   Upon the death of any Member, should the remaining Members unanimously elect to continue the business of the Company, the Company shall not be affected but the decedent's estate (or any beneficiary of the deceased Member's Company Interest) shall become a Member and all provisions of this Company Agreement shall remain in full force and effect.

(10.2)   Notwithstanding the foregoing, if the beneficiary of the deceased Member's Interest is other than (I) a then living descendent, sibling or parent of such deceased Member, (ii) another then Member or (iii) a trust for the benefit of any of the foregoing or the spouse of any of the foregoing (provided however that the trust provides that with respect to the spouse, the spouse is only to receive the income from the trust and that the principal of such trust can only be distributed to any of the foregoing specified persons, exclusive of the spouse), then the Company shall have the option by giving written notice to the estate (or beneficiary of the Company Interest) of the deceased Member within ninety (90) days of the death of such deceased partner to purchase the deceased Member's Company Interest.  The purchase price and terms of payment for such Company Interest shall be computed in accordance with the provisions of Section 12 below as of the last day of the fiscal quarter of the Company immediately preceding the death of such Member.  The decision as to whether to exercise such option shall be made by a vote of the majority in interest of the Members (exclusive of the holder of the Company Interest of the deceased Member).

## SECTION 11. TRANSFERABILITY

(11.1)   A member shall not assign, pledge, encumber, or in any manner whatsoever transfer all or any portion of his interest in the Company without the written consent of a majority of the remaining Members except in accordance with the provisions of this Agreement.

(11.2)   In the event a Member desires to assign or transfer all or any portion of his Company Interest, except as otherwise provided in Section 11.9 below, he shall first offer to sell all of his Company Interest to the remaining Member(s) by giving written notice to each remaining Member.

6

(11.3)  Each of the remaining Members shall thereupon have the right, within thirty (30) days after the receipt of such notice, by giving written notice of such election to the selling Member and to the other Members, to purchase such portion from the selling Member's Company Interest as the remaining Member's Company Interest at such date shall bear to the total Company Interests owned by all of the remaining Members after excluding the Company Interest of the selling Member; provided, however, that if any remaining Member does not elect to purchase his portion of the Company Interest of the Selling Member, then any other remaining member shall have the right to purchase such Company Interest of the Selling Member.  The purchase price of such Company . Interest shall be computed in accordance with the provisions of Section 12 below.  If the remaining Members do not elected to purchase the Company Interest of the Selling Member at the above established price, then the Selling Member may sell all, but not less than all, of his Company Interest in the Company to a bona fide third-party purchaser, provided, however, that the Selling Member shall not so sell his Company Interest without first re-offering his Company Interest to the remaining Members in accordance with the method established above if the price to be paid by the bona fide third-party purchase is less than the price established above or, if the amortization or the terms of any note being received from the purchase are different.

(11.4)  In the event of the purchase of the Company Interest of a Selling Member by the remaining Members as provided above, the Selling Member shall assign, transfer, set over to the purchaser or purchasers, all of his right, title and interest in the Company and the purchaser(s) shall agree in writing to indemnify and save the Selling Member harmless from any obligations assumed by the purchaser(s) with respect to the Company. An amended and Restated Operating Agreement (and Trade Name Certificate) will be executed and recorded by the Members.

(11.5)  The assignment by a Member of his Company Interest in accordance with the above shall have no effect upon the continuance of the Company business.  If there shall be any loans between the Selling Member and the Company, they shall be due and payable at the time of the assignment of his Company Interest.

(11.6)  Each and every transfer of a Company Interest shall be subject to the terms and provisions of this Agreement, and to any amendment thereof, with the same force and effect as if the transferor had originally been a party to this Agreement with all the rights and obligations of his transferee.

(11.7)  Before any transfer shall be valid, the Managing Member must consent to such a transfer and the transferee shall deliver to the remaining Members a statement acknowledging that the transferee has read the provisions of this Agreement and intends to be legally bound by all of the terms and conditions of this Agreement and any amendments or modifications thereto.

7

(11.8)  Any transfer or encumbrance of a Member's Company Interest in contravention of this Section shall be null and void.

(11.9)  Notwithstanding anything to the contrary, any Member without the prior consent of the other Members or of the Company may transfer to his children and/or grandchildren or to a trust for the benefit of his children and/or grandchildren or to another Member, or to the children and/or grandchildren of another Member, as a gift or otherwise, all or any portion of his Company Interest.  In the event of any such transfer, the transferee shall receive and hold the Company Interest so transferred subject to the terms of this Agreement.

## SECTION 12. PURCHASE PRICE AND TERMS

(12.1)(a)        The purchase price for a Member's interest purchased hereunder shall equal the Member's capital account as shown on the books of the Company at the end of the last preceding fiscal year, increased or decreased by his share of the Company's profits or losses for the period from the beginning of the then current fiscal year until the end of the month coincident with or immediately preceding the triggering event permitting the option to sell his Company Interest or his death, whichever is applicable.  The Member's capital account and Member income and losses shall be determined by the accounting firm then servicing the Company in accordance with generally accepted accounting principles, adjusted to reflect the fair market value of all real property owned by the Company as of the end of said month.

The market value of all real property owned by the Company shall be determined annually by mutual agreement of the Members.  Such annual determination of market value may be agreed on in writing by the Members and filed with the Company records.  The determination of market value agreed upon by the Members within one (1) month prior to such purchase shall be deemed its fair market value in calculating the purchase price; provided, however, that if no such annual determination of market value has been agreed upon by the Members within said one (1) month period and the Members are unable to then agree on the market value, such value shall be determined by an MAI appraiser selected by the Members.  If the Members are unable to agree on an MAI appraiser, then each member shall select an appraiser, and those appraisers selected shall then collectively designate one different MAI appraiser to perform this function.

(b)        Payment of the purchase price for a Company Interest purchased hereunder, at the option of the remaining Members, shall be made as follows:

There shall be payable in cash settlement twenty (20) percent of the purchase price.  The balance of the purchase price shall be payable by each remaining Member's delivery at settlement of his collateral note payable to the order of the seller in the principal sum equal to such pro rata balance of the purchase price plus interest on the unpaid balance of principal at the rate of the Wall Street Prime Rate plus one (1) percent.  Said principal and interest shall be payable in twelve (12) consecutive equal installments,

8

with the first such installment becoming payable one (1) year following the date of settlement of said Company interest.

## SECTION 13. DISSOLUTION

(13.1)  The Company shall be dissolved in accordance with the terms of this Agreement, upon the occurrence of any of the events of dissolution specified in Section 4.1.  Upon such a dissolution, the affairs of the Company shall be wound up. and the assets of the Company distributed to all of the Members (or their personal representatives, as the case may be) in complete liquidation of the Company as hereinafter set forth:

a)  First, to the payment of debts and liabilities of the Company, including any debts due and owing to Members (which payment shall be in proportion to the debts owed to each Member) and the expenses of liquidation);

b)  Second, to the establishment of any reserves which the Managing Member deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

c)  Third, to the payment and discharge of the undrawn profits of any Member or the estate or legal representative of any Member;

d)  Fourth, to the payment and discharge of the respective capital accounts of the Members, such payments to be in proportion to each Member's capital account;

e)  Fifth, any excess shall be distributed among the Members and the legal representatives of any Members in proportion to their respective Company Interest immediately prior to the event causing the dissolution.

(13.2)  Notwithstanding the fact that the Company shall be deemed to be dissolved under the laws of the State of Missouri, the Company shall be considered as "continuing" for Federal Income Tax purposes if it is not "terminated" within the meaning of Section 708(b) of the Internal Revenue Code of 1954 as amended, or any corresponding provision of successor legislation regarding termination of the Company,

## SECTION 14. MANAGEMENT

(14.1)  The Managing Member shall devote whatever of his time and effort is necessary to the conduct of the Company business, but it is understood that neither he or any of the other Members shall be required to devote their full time of the Company business.

(14.2) The Managing Member shall have the sole and exclusive right to make all decisions and to act on behalf of the Company, except on decisions which would place debt against any property owned by the Company, in excess of $500. All decisions

9

relating to financing of property must be approved by the majority interest of the members shares.

(14.3) Any sale or purchase of real assets must be approved by the majority interest of the members shares.

(14.4) The Managing Member shall be the Company's "tax matters partner" within the meaning of Internal Revenue Code 6231(a)(7) ("Code"). The Members agree to execute such statements or documents as may be necessary to designate the Managing Member as such for purpose of the Code. The Managing Member will promptly send to the other Member copies of all notices or communications received by the Company from the Internal Revenue Service or any local tax authority relating to any adjustment or proposed adjustment or examination of any tax return filed by the Company.

## SECTION 15. COMPANY PROPERTY

(15.1) Title to any real estate to be acquired by the Company shall be taken in the name of the Company. All other property held or acquired by the Company shall also be held or acquired in the Company name.

(15.2) All agreements which could legally bind the Company including, without limitation, agreements of sale, financing documents, conveyances of real estate, leases, service agreements and employment agreements shall be binding if signed by the Managing Member, as long as a formal resolution is signed by the majority of the shareholders prior to execution on any financial transaction in excess of $500.

## SECTION 16. INDEMNIFICATION AND REIMBURSEMENT OF MANAGING MEMBER

(16.1) The Managing Member shall not be liable to the Company or any other Member with respect to any decision, act or failure to act pertaining to the Company's affairs, business or assets, and the Company shall defend, indemnify and hold harmless the Managing Member against all claims, losses and expenses (including, without limitation, reasonable legal fees) incurred as a result of any action, decision, or omissions performed or made by the Managing Member in connection with the Company's business, unless the same constitutes fraud, or willful misconduct. Any such indemnity shall be provided out of and to the extent of the Company's assets only, and no Member shall have any personal liability or obligation on account thereof.

## SECTION 17. MISCELLANEOUS PROVISIONS

(17.1) Notice: Except as otherwise provided herein, any notice to be given under the Agreement or otherwise in connection with the business of the Company shall be duly given if reduced to writing and delivered personally to the person to whom it is

authorized to be given, or if sent by certified mail, return receipt requested, to such address as may be furnished by said Member in writing to the Company.

(17.2)   Merger of Prior Agreements:  This Agreement contains the sole and entire agreement and understanding of the parties with respect to the entire subject matter hereof.  Any and all prior discussions, negotiations, commitments and understanding relating thereto are hereby merged herein.  This Agreement may be changed or terminated only by written agreement executed by all of the Members.

(17.3)   Validity:  If any provision of this Agreement, or the application of any such provisions to any person or circumstance, is held invalid or unenforceable, the remainder of this Agreement, or the application of such provision to person or circumstances other than those as to which it is held invalid or enforceable, shall not be affected thereby.

(17.4)   Applicable Law:  This Agreement, and the application and interpretation hereof, and the rights and obligations of the parties hereunder shall be construed under and governed exclusively by its terms and by the laws of the State of Missouri.  By entering into this Agreement, each Member confers exclusive jurisdiction in the courts of the State of Pennsylvania or the United States District Court for the District of Pennsylvania (Philadelphia) in all suits or other actions whether at law or in equity, brought by such Member against any other Member or other Member's Affiliates for all matters and disputes arising out of this Agreement.  By entering into this Agreement, each member waives any right to trial by jury with respect to any mater or dispute arising out of this Agreement.

(17.5)   Partition:  The Members agree that the Company's property is not and will not be suitable for partition.  Accordingly, each Member hereby irrevocably waives any and all rights that he may have to maintain any action for partition of any of the Company's property.

(17.6)   Construction:  Throughout this Agreement, the masculine gender shall be deemed to include the feminine and neuter, and the singular, the plural, and vice versa, except where the context clearly requires otherwise.

(17.7)   Binding Nature:  This Agreement shall be binding upon the parties hereto, and their respective heirs, legal representatives, executors, administrators and assigns.

11

IN WITNESS WHEREOF, this undersigned Members have executed this Agreement on the date first above written.

WITNESS: _____        _____
                                           NICKOLAS W. SEKOGIAN, III

WITNESS: _____        _____
                                           LUIS A. COZZA

WITNESS: _____        _____
                                           FERNANDO COZZA

12

SCHEDULE "A"


CAPITAL ACCOUNT

COMPANY INTEREST


| | |
|---|---|
| NICKOLAS W. JEKOGIAN, III | $333.33 |
| LUIS A. COZZA | $333.33 |
| FERNANDO COZZA | $333.33 |

13

# EXHIBIT "3"



State of Missouri
Creation - LLC/LP 1 Page(s)



T0316815635

**File Number: 200317412954**
**Date Filed: 06/16/2003 03:45 PM**
**Matt Blunt**
**Secretary of State**
Matt Blunt, Secretary of State

rporations Division
.O. Box 778 / 600 W. Main Street, Rm 322
Jefferson City, MO  65102

## Articles of Organization
(Submit in duplicate with filing fee of $105)

1.  The name of the limited liability company is:

    Plaza Property Group, L.L.C
    *(Must include "Limited Liability Company," "Limited Company," "LC," "L.C.," "L.L.C.," or "LLC")*

2.  The purpose(s) for which the limited liability company is organized:

    Real Estate Ownership

3.  The name and address of the limited liability company's registered agent in Missouri is:

    Matt Gietzen            4545 Main Street, apt. # 1            Kansas City, MO, 64111
    *Name*                  *Street Address: May not use P.O. Box unless street address also provided*            *City/State/Zip*

4.  The management of the limited liability company is vested in one or more managers.   [✔] Yes   [ ] No

5.  The events, if any, on which the limited liability company is to dissolve or the number of years the limited liability company is to continue, which may be any number or perpetual:

    Perpetual
    *(The answer to this question could cause possible tax consequences, you may wish to consult with your attorney or accountant)*

6.  The name(s) and street address(es) of each organizer (Post Office box alone not acceptable):

    Luis Cozza       1600 Market Street, Suite 1410,       Philadelphia, PA 19103

7.  For tax purposes, is the limited liability company considered a corporation?   [✔] Yes   [ ] No

8.  The effective date of this document is the date it is filed by the Secretary of State of Missouri, unless you

    indicate a future date, as follows: _____✔_____
    *(Date may not be more than 90 days after the filing date in this office)*

**In Affirmation thereof, the facts stated above are true:**

_____          Luis Cozza                6-2-03
(Organizer Signature)                   (Printed Name)            (Date)

_____          _____      _____
(Organizer Signature)                   (Printed Name)            (Date)

_____          _____      _____
(Organizer Signature)                   (Printed Name)            (Date)

LLC-1 (12/02)

# State of Missouri



Matt Blunt
Secretary of State

CERTIFICATE OF ORGANIZATION

WHEREAS,

*Plaza Property Group, L.L.C.*
*LC0527594*

filed its Articles of Organization with this office on the 16th day of June, 2003, and that filing was found to conform to the Missouri Limited Liability Company Act.

NOW, THEREFORE, I, MATT BLUNT, Secretary of State of the State of Missouri, do by virtue of the authority vested in me by law, do certify and declare that on the 16th day of June, 2003, the above entity is a Limited Liability Company, organized in this state and entitled to any rights granted to Limited Liability Companies.

IN TESTIMONY WHEREOF, I have set my hand and imprinted the GREAT SEAL of the State of Missouri, on this, the 16th day of June, 2003.



_____
Secretary of State

# EXHIBIT "4"

# OPERATING AGREEMENT

## OF

## PLAZA PROPERTY GROUP, LLC

### Kansas City, Missouri

AGREEMENT made this 3rd day of October, 2003, by and between Nickolas W. Jekogian, III and Luis A. Cozza and Fernando Cozza sometimes being referred to herein individually as "Member" and collectively as "Members".

### WITNESSETH:

WHEREAS, the parties hereto desire to form a Limited Liability Company pursuant to the laws of the State of Missouri for the purpose and upon the terms and conditions hereinafter set forth.

### SECTION 1. FORMATION

(1.1)   The parties agree to form a Limited Liability Company (the "Company") under the State of Missouri Limited Liability Company Act ("Act").

(1.2)   In connection with the execution of this Operating Agreement, the Members shall cause a Certificate of Organization that complies with the requirements of the Act to be properly filed with the Superintendent of Corporations of the District of Columbia, and shall execute such further documents (including amendments to the Certificate of Organization) and take such further action as is appropriate to comply with the requirements of the law for the formation or operation of a limited liability company in all states and counties where the Company may conduct its business.

(1.3)   The parties shall cause to be filed with the appropriate office in each jurisdiction in which the Company conducts business all certificates required by the Fictitious Name Act or Assumed Name Act or any similar statute in effect in each such jurisdiction.

(1.4)   The business of the Company shall be conducted under the name PLAZA PROPERTY GROUP, LLC.

(1.5)   The location of the registered office of the Company shall be 4545 Main St. Apt. 1 Kansas City, MO 64111 and thereafter at such location as the Managing Member may designate.  The Company's registered agent shall be Matthew Gietzen with an address of 4545 Main St. Apt. 1 Kansas City, MO 64111.

(1.6)   The principal office of the Company shall be maintained at 1600 Market Street – Suite 1410, Philadelphia, PA 19103, or at such other place(s) as the Managing Member may from time-to-time determine.

## SECTION 2. MEMBERS

(2.1)   The Members shall be Nickolas W. Jekogian, III and Luis A. Cozza and Fernando Cozza. Luis A. Cozza and Nickolas W. Jekogian III shall be "Managing Member." Should either party cease, for any reason, to be the Managing Member, then Fernando Cozza shall be Managing Member.

(2.2)   Each Member's percentage interest in the Company's capital and income (the "Company Interest") shall be as set forth below:

| Name | Interest |
|------|----------|
| Nickolas W. Jekogian, III | 18.80 % |
| Luis A. Cozza | 40.60 % |
| Fernando Cozza | 40.60% |

*(handwritten annotations: .0188, .4060, .4060)*

(2.3)   Whenever any voting is to take place under this Operating Agreement, each Member shall have the number of votes equal to such Member's Company Interest.

## SECTION 3. PURPOSE OF THE COMPANY

(3.1)   The purpose of the Company shall be real estate investment.

(3.2)   In addition to the purpose set forth in Section 3.1, the Company may also transact any and all businesses, which a limited liability company may transact under the Act.

## SECTION 4. TERM

(4.1)   Unless sooner dissolved by operation of law or as provided by this Agreement, the term of this Company shall commence on the date first written above and shall continue until December 5, 2031; unless sooner dissolved by:

a)      The affirmative vote of Members whose Company Interest equals more than 60% of all of the Company Interest;

b)      The sale, expiration, abandonment or other disposition of substantially all of the Company assets;

c)      Dissolution of the Company by judicial decree or operation by law;

d)      Any event which makes it unlawful for the business of the Company to be carried on by the Members;

e)    The death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company; or

f)    Any other event causing a dissolution of a limited liability company under the Act.

(4.2)    Notwithstanding the foregoing provisions of Section 4.1 upon the occurrence of an event described in Section 4.1 (e), if there are at least two remaining Members, the remaining Members have the right to continue the business of the Company. Such right can be exercised only by the affirmative unanimous vote of the remaining Members within 90 days after the occurrence of an event described in Section 4.1 (e), to continue the business of the Company. If not so exercised, the right of the Members to continue the business of the Company shall expire and the Company's affairs shall be wound up as provided in Section 13.

## SECTION 5. CAPITAL CONTRIBUTION OF MEMBERS

(5.1)    Each Member, upon execution of this Agreement, shall contribute to the Company, as such Member's initial capital contribution, the sum set forth to his name as follows:

| Name | Capital Contribution |
| --- | --- |
| Nickolas W. Jekogian, III | $333.33 |
| Luis A. Cozza | $333.33 |
| Fernando Cozza | $333.33 |

(5.2)    An individual capital account shall be maintained for each Member. The capital account shall reflect each Member's initial contribution to the Company at its fair market value.

(5.3)    The Capital Account of the Members shall be maintained in accordance with Internal Revenue Reg. 1.704-1(b)(2)(iv) as in effect on the date hereof or as amended in the future. Each Member's capital account shall be increased by (I) the amount of money contributed by such Member to the Company; (ii) the fair market value of property contributed by such member of the Company (net of liabilities secured by such property that the Company is considered to be assumed or take subject to under Internal Revenue Code Section 752); and (iii) allocations to such Member of Company income and gain including income and gain exempt from tax and income and gain described in Treas. Reg. 1.704-1(b)(iv)(g), and shall be reduced by (iv) the amount of money distributed to such Member by the Company; (v) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such property that such Member is considered to assume or take subject to under Internal Revenue Code Section 752); (vi) allocations to such Member of expenditures of the Company described

3

in Internal Revenue Code 705(a)(2)(B) (relating to expenditures which are neither deductible nor properly chargeable to capital); and (vii) allocations to such Member of Company loss and deduction, or item thereof, (including loss and deduction described in Treas. Reg. 1.704-1(b)(2)(iv)(g)).

(5.4)    Prior to debiting a Member's capital account to reflect a distribution of property to such Member as provided in clause (v) of Section 5.3 above, the capital accounts of all Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in such property (that has not been previously reflected in the capital accounts) would be allocated among the Members under this Section, as appropriate if such property were disposed of in a taxable transaction for its fair market value on the date of the distribution of such property to such Member.

(5.5)    If the time for determining that capital account of a Member is not the close for the Company accounting year, such Member's distributive share of any Company item listed in Section 5.3 above shall be for the period from the close of the last such Company accounting year to such date.

(5.6)    No interest shall be paid by the Company with respect to the capital accounts.

(5.7)    No Member shall withdraw any part of his capital account without the consent of the majority in interest of the Members.

## SECTION 6. LOANS

(6.1)    **Loans by Members.**  Any Member may, but shall not be obligated to, loan money to the Company.  The amount of any such loan shall not be deemed an increase in the Capital Account of the Member making such loan to the Company  or a contribution to the capital of the Company, nor shall it entitle such Member to an increase in such Member's share of the distributions of the Company.  The amount of any such loan and interest thereon shall be fixed by agreement of all members, but in no event shall such interest exceed the maximum rate allowed by law or be less than the then present applicable federal rate published by the Internal Revenue Service.  The loan shall be deemed an obligation of indebtedness from the Company to the Member making such loan and shall be payable out of the Cash Flow of the Company before any distributions to Members, or if earlier, upon dissolution of the Company, or upon such other terms as may be agreed upon.

## SECTION 7. PROFITS AND LOSSES

(7.1)    The term **"Profits and Losses"** shall refer to the income or loss of the Company for Federal Income Tax purpose determined as of the close of the Company's

4

fiscal year, taking into account federal tax items such as capital gain or loss, tax preference items, credits and depreciation recapture.

(7.2)   The net profits and losses of the Company for each calendar year shall be allocated in accordance with each Member's Company Interest;

(7.3)   Notwithstanding Section (7.2), gain or loss with respect to property contributed to the Company by a Member shall be allocated to the Member who contributed the property so as to take into account the difference, if any, between the tax basis of the property to the Company and its fair market value at the time of contribution to the Company pursuant to Internal Revenue Code Section 704(c) and the Treasury Regulations thereunder.

(7.4)   If requested by any Member, the Company, to the extent permitted by law, shall make an election under Section 754 of the Internal Revenue with respect to the transfer by sale or exchange of the Company Interest of any Member.

## SECTION 8. DISTRIBUTIONS

(8.1)   The term "**net cash receipts available for distribution**" as used herein shall mean all cash receipts from operations with respect to a taxable year less all cash disbursements, including expenditures for (I) capital improvements, (ii) principal and interest payments on mortgages and other indebtedness of the Company, (iii) cash expenditures incurred incident to the operation of the Company's business, including all salaries paid pursuant to this Agreement, and (iv) such cash reserves as the Managing Member deems reasonably necessary for the proper operation of the Company business.

(8.2)   The net cash receipts available for distribution shall be distributed from time-to-time as the Managing Member, or by unanimous agreement of all members, deems appropriate, to the Member in accordance with their respective Company Interest as set forth in Section 2.2.

## SECTION 9. PURCHASE OPTION OF THE COMPANY

(9.1)   Upon the filing of a bankruptcy petition by any Member of the filing of any bankruptcy action against any Member by his creditors which is not dismissed within sixty (60) days, or an attachment or levy upon the Company Interest of any Member, or an order being entered by a court of competent jurisdiction requiring a Member to transfer his Company Interest, or any involuntary transfer by a Member of his Company Interest, should the remaining Members elect to continue the business of the Company, the Member (or his legal representative) (the "Seller Member" shall give written notice to the Company of such event and shall be deemed to have offered to sell his Company Interest to the Company. The Company shall have the option to then purchase all of the Selling Member's Company Interest in the Company. Should the majority in interest of the Members (exclusive of the Member with respect to whose Company Interest the option is

then applicable) desire to have the Company purchase such Company Interest, then the Company shall give written notice of the exercise of its option to the Selling Member within thirty (30) days of the receipt of the Selling Member's notice.

(9.2)   The purchase price for such Company Interest shall be computed as of the last day of the fiscal quarter immediately preceding the date of the Selling Member's notice and the price and terms shall be in accordance with the provisions of Section 12 below.

## SECTION 10. DEATH OF A MEMBER

(10.1)  Upon the death of any Member, should the remaining Members unanimously elect to continue the business of the Company, the Company shall not be affected but the decedent's estate (or any beneficiary of the deceased Member's Company Interest) shall become a Member and all provisions of this Company Agreement shall remain in full force and effect.

(10.2)  Notwithstanding the foregoing, if the beneficiary of the deceased Member's Interest is other than (I) a then living descendent, sibling or parent of such deceased Member, (ii) another then Member or (iii) a trust for the benefit of any of the foregoing or the spouse of any of the foregoing (provided however that the trust provides that with respect to the spouse, the spouse is only to receive the income from the trust and that the principal of such trust can only be distributed to any of the foregoing specified persons, exclusive of the spouse), then the Company shall have the option by giving written notice to the estate (or beneficiary of the Company Interest) of the deceased Member within ninety (90) days of the death of such deceased partner to purchase the deceased Member's Company Interest.  The purchase price and terms of payment for such Company Interest shall be computed in accordance with the provisions of Section 12 below as of the last day of the fiscal quarter of the Company immediately preceding the death of such Member.  The decision as to whether to exercise such option shall be made by a vote of the majority in interest of the Members (exclusive of the holder of the Company Interest of the deceased Member).

## SECTION 11. TRANSFERABILITY

(11.1)  A member shall not assign, pledge, encumber, or in any manner whatsoever transfer all or any portion of his interest in the Company without the written consent of a majority of the remaining Members except in accordance with the provisions of this Agreement.

(11.2)  In the event a Member desires to assign or transfer all or any portion of his Company Interest, except as otherwise provided in Section 11.9 below, he shall first offer to sell all of his Company Interest to the remaining Member(s) by giving written notice to each remaining Member.

6

(11.3)  Each of the remaining Members shall thereupon have the right, within thirty (30) days after the receipt of such notice, by giving written notice of such election to the selling Member and to the other Members, to purchase such portion from the selling Member's Company Interest as the remaining Member's Company Interest at such date shall bear to the total Company Interests owned by all of the remaining Members after excluding the Company Interest of the selling Member; provided, however, that if any remaining Member does not elect to purchase his portion of the Company Interest of the Selling Member, then any other remaining member shall have the right to purchase such Company Interest of the Selling Member.  The purchase price of such Company Interest shall be computed in accordance with the provisions of Section 12 below.  If the remaining Members do not elected to purchase the Company Interest of the Selling Member at the above established price, then the Selling Member may sell all, but not less than all, of his Company Interest in the Company to a bona fide third-party purchaser, provided, however, that the Selling Member shall not so sell his Company Interest without first re-offering his Company Interest to the remaining Members in accordance with the method established above if the price to be paid by the bona fide third-party purchase is less than the price established above or, if the amortization or the terms of any note being received from the purchase are different.

(11.4)  In the event of the purchase of the Company Interest of a Selling Member by the remaining Members as provided above, the Selling Member shall assign, transfer, set over to the purchaser or purchasers, all of his right, title and interest in the Company and the purchaser(s) shall agree in writing to indemnify and save the Selling Member harmless from any obligations assumed by the purchaser(s) with respect to the Company. An amended and Restated Operating Agreement (and Trade Name Certificate) will be executed and recorded by the Members.

(11.5)  The assignment by a Member of his Company Interest in accordance with the above shall have no effect upon the continuance of the Company business.  If there shall be any loans between the Selling Member and the Company, they shall be due and payable at the time of the assignment of his Company Interest.

(11.6)  Each and every transfer of a Company Interest shall be subject to the terms and provisions of this Agreement, and to any amendment thereof, with the same force and effect as if the transferor had originally been a party to this Agreement with all the rights and obligations of his transferee.

(11.7)  Before any transfer shall be valid, the Managing Member must consent to such a transfer and the transferee shall deliver to the remaining Members a statement acknowledging that the transferee has read the provisions of this Agreement and intends to be legally bound by all of the terms and conditions of this Agreement and any amendments or modifications thereto.

(11.8)  Any transfer or encumbrance of a Member's Company Interest in contravention of this Section shall be null and void.

(11.9)  Notwithstanding anything to the contrary, any Member without the prior consent of the other Members or of the Company may transfer to his children and/or grandchildren or to a trust for the benefit of his children and/or grandchildren or to another Member, or to the children and/or grandchildren of another Member, as a gift or otherwise, all or any portion of his Company Interest.  In the event of any such transfer, the transferee shall receive and hold the Company Interest so transferred subject to the terms of this Agreement.

## SECTION 12. PURCHASE PRICE AND TERMS

(12.1)(a)    The purchase price for a Member's interest purchased hereunder shall equal the Member's capital account as shown on the books of the Company at the end of the last preceding fiscal year, increased or decreased by his share of the Company's profits or losses for the period from the beginning of the then current fiscal year until the end of the month coincident with or immediately preceding the triggering event permitting the option to sell his Company Interest or his death, whichever is applicable.  The Member's capital account and Member income and losses shall be determined by the accounting firm then servicing the Company in accordance with generally accepted accounting principles, adjusted to reflect the fair market value of all real property owned by the Company as of the end of said month.

The market value of all real property owned by the Company shall be determined annually by mutual agreement of the Members.  Such annual determination of market value may be agreed on in writing by the Members and filed with the Company records. The determination of market value agreed upon by the Members within one (1) month prior to such purchase shall be deemed its fair market value in calculating the purchase price; provided, however, that if no such annual determination of market value has been agreed upon by the Members within said one (1) month period and the Members are unable to then agree on the market value, such value shall be determined by an MAI appraiser selected by the Members.  If the Members are unable to agree on an MAI appraiser, then each member shall select an appraiser, and those appraisers selected shall then collectively designate one different MAI appraiser to perform this function.

(b)    Payment of the purchase price for a Company Interest purchased hereunder, at the option of the remaining Members, shall be made as follows:

There shall be payable in cash settlement twenty (20) percent of the purchase price.  The balance of the purchase price shall be payable by each remaining Member's delivery at settlement of his collateral note payable to the order of the seller in the principal sum equal to such pro rata balance of the purchase price plus interest on the unpaid balance of principal at the rate of the Wall Street Prime Rate plus one (1) percent. Said principal and interest shall be payable in twelve (12) consecutive equal installments,

8

with the first such installment becoming payable one (1) year following the date of settlement of said Company interest.

## SECTION 13. DISSOLUTION

(13.1)  The Company shall be dissolved in accordance with the terms of this Agreement, upon the occurrence of any of the events of dissolution specified in Section 4.1.  Upon such a dissolution, the affairs of the Company shall be wound up. and the assets of the Company distributed to all of the Members (or their personal representatives, as the case may be) in complete liquidation of the Company as hereinafter set forth:

a)  First, to the payment of debts and liabilities of the Company, including any debts due and owing to Members (which payment shall be in proportion to the debts owed to each Member) and the expenses of liquidation);

b)  Second, to the establishment of any reserves which the Managing Member deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

c)  Third, to the payment and discharge of the undrawn profits of any Member or the estate or legal representative of any Member;

d)  Fourth, to the payment and discharge of the respective capital accounts of the Members, such payments to be in proportion to . each Member's capital account;

e)  Fifth, any excess shall be distributed among the Members and the legal representatives of any Members in proportion to their respective Company Interest immediately prior to the event causing the dissolution.

(13.2)  Notwithstanding the fact that the Company shall be deemed to be dissolved under the laws of the State of Missouri, the Company shall be considered as "continuing" for Federal Income Tax purposes if it is not "terminated" within the meaning of Section 708(b) of the Internal Revenue Code of 1954 as amended, or any corresponding provision of successor legislation regarding termination of the Company.

## SECTION 14. MANAGEMENT

(14.1)  The Managing Member shall devote whatever of his time and effort is necessary to the conduct of the Company business, but it is understood that neither he or any of the other Members shall be required to devote their full time of the Company business.

(14.2) The Managing Member shall have the sole and exclusive right to make all decisions and to act on behalf of the Company, except on decisions which would place debt against any property owned by the Company, in excess of $500. All decisions

9

relating to financing of property must be approved by the majority interest of the members shares.

(14.3) Any sale or purchase of real assets must be approved by the majority interest of the members shares.

(14.4)  The Managing Member shall be the Company's "tax matters partner" within the meaning of Internal Revenue Code 6231(a)(7) ("Code").  The Members agree to execute such statements or documents as may be necessary to designate the Managing Member as such for purpose of the Code.  The Managing Member will promptly send to the other Member copies of all notices or communications received by the Company from the Internal Revenue Service or any local tax authority relating to any adjustment or proposed adjustment or examination of any tax return filed by the Company.

## SECTION 15. COMPANY PROPERTY

(15.1)  Title to any real estate to be acquired by the Company shall be taken in the name of the Company.  All other property held or acquired by the Company shall also be held or acquired in the Company name.

(15.2)  All agreements which could legally bind the Company including, without limitation, agreements of sale, financing documents, conveyances of real estate, leases, service agreements and employment agreements shall be binding if signed by the Managing Member, as long as a formal resolution is signed by the majority of the shareholders prior to execution on any financial transaction in excess of $500.

## SECTION 16. INDEMNIFICATION AND REIMBURSEMENT OF MANAGING MEMBER

(16.1)  The Managing Member shall not be liable to the Company or any other Member with respect to any decision, act or failure to act pertaining to the Company's affairs, business or assets, and the Company shall defend, indemnify and hold harmless the Managing Member against all claims, losses and expenses (including, without limitation, reasonable legal fees) incurred as a result of any action, decision, or omissions performed or made by the Managing Member in connection with the Company's business, unless the same constitutes fraud, or willful misconduct.  Any such indemnity shall be provided out of and to the extent of the Company's assets only, and no Member shall have any personal liability or obligation on account thereof.

## SECTION 17. MISCELLANEOUS PROVISIONS

(17.1)  Notice:  Except as otherwise provided herein, any notice to be given under the Agreement or otherwise in connection with the business of the Company shall be duly given if reduced to writing and delivered personally to the person to whom it is

authorized to be given, or if sent by certified mail, return receipt requested, to such address as may be furnished by said Member in writing to the Company.

(17.2)  Merger of Prior Agreements:  This Agreement contains the sole and entire agreement and understanding of the parties with respect to the entire subject matter hereof.  Any and all prior discussions, negotiations, commitments and understanding relating thereto are hereby merged herein.  This Agreement may be changed or terminated only by written agreement executed by all of the Members.

(17.3)  Validity:  If any provision of this Agreement, or the application of any such provisions to any person or circumstance, is held invalid or unenforceable, the remainder of this Agreement, or the application of such provision to person or circumstances other than those as to which it is held invalid or enforceable, shall not be affected thereby.

(17.4)  Applicable Law:  This Agreement, and the application and interpretation hereof, and the rights and obligations of the parties hereunder shall be construed under and governed exclusively by its terms and by the laws of the State of Missouri.  By entering into this Agreement, each Member confers exclusive jurisdiction in the courts of the State of Pennsylvania or the United States District Court for the District of Pennsylvania (Philadelphia) in all suits or other actions whether at law or in equity, brought by such Member against any other Member or other Member's Affiliates for all matters and disputes arising out of this Agreement.  By entering into this Agreement, each member waives any right to trial by jury with respect to any mater or dispute arising out of this Agreement.

(17.5)  Partition:  The Members agree that the Company's property is not and will not be suitable for partition.  Accordingly, each Member hereby irrevocably waives any and all rights that he may have to maintain any action for partition of any of the Company's property.

(17.6)  Construction:  Throughout this Agreement, the masculine gender shall be deemed to include the feminine and neuter, and the singular, the plural, and vice versa, except where the context clearly requires otherwise.

(17.7)  Binding Nature:  This Agreement shall be binding upon the parties hereto, and their respective heirs, legal representatives, executors, administrators and assigns.

IN WITNESS WHEREOF, this undersigned Members have executed this Agreement on the date first above written.

WITNESS:

NICKOLAS W. JEKOGIAN, III

WITNESS:

LUIS A. COZZA

WITNESS:

FERNANDO COZZA

12

SCHEDULE "A"

CAPITAL ACCOUNT

COMPANY INTEREST

NICKOLAS W. JEKOGIAN, III          $400.60          180.80

LUIS A. COZZA                      $400.60

FERNANDO COZZA                     $180.80          400.60

# EXHIBIT "5"

State of Missouri
Creation - General Business - Domestic 6 Page(s)



File Number: 200528720407
00691586
Date Filed: 10/14/2005
Robin Carnahan
Secretary of State

T0528756214

## ARTICLES OF INCORPORATION

### ARTICLE ONE

The name of the corporation is:  NWJ Kansas City, Inc.

### ARTICLE TWO

Registered agent's name:       Husch Registered Agent, Inc.
Address, including street and number, for the registered agent's office in the state of Missouri:
235 E. High Street, Jefferson City, Missouri 65101

### ARTICLE THREE

The aggregate number, class, and par value of shares that the corporation shall have authority to issue shall be thirty thousand (30,000) shares of common stock having a par value of One Dollar ($1.00) per share amounting in the aggregate to Thirty Thousand Dollars ($30,000.00).

### ARTICLE FOUR

The name and physical business or residence address of the incorporator are as follows:

| Name | Street | City and State |
|------|--------|----------------|
| Stacy E. Wipfler | 190 Carondelet Plaza, Suite 600 | St. Louis, MO 63105 |

### ARTICLE FIVE

The duration of the corporation is perpetual.

### ARTICLE SIX

The purpose for which the Corporation was formed is set forth as follows:

Notwithstanding any other provision of these Articles of Incorporation, any other organizational documents or any provisions of law that empowers NWJ Kansas City, Inc. (the "Corporation"), the following provisions shall be operative and controlling so long as the loan (the "Loan") by Prudential Mortgage Capital Company, LLC or its successors and/or assigns (collectively, the "Lender") to Nicks Properties, L.L.C. (the "Company"), Kansas City Equities L.L.C. and Plaza Property Group, L.L.C., is outstanding:

1.      The sole purpose for which the Corporation is organized is to acquire, manage, own and hold membership interest in the Company, whose sole purpose is to acquire, own, hold, maintain

2171614.01

and operate the following properties: 4406-4418 Pennsylvania Avenue, Kansas City, Missouri; 209 Brush Creek, Kansas City, Missouri; 4505-4507 Jarboe Street, Kansas City, Missouri. Each of the aforesaid properties are mortgaged as collateral for the Loan, together with such other activities as may be necessary or advisable in connection with such limited purpose. The Corporation shall not engage in any business, and it shall have no purpose, unrelated to the foregoing purpose and shall not acquire any real property or own assets other than those in furtherance of the limited purposes of the Corporation.

2.      The Corporation shall have no authority to perform any act in violation of any (a) applicable laws or regulations or (b) any agreement between the Company and the Lender or the Corporation and the Lender.

3.      The Corporation shall not:

(a)      make any loans to any shareholder or the Corporation's or any shareholder's Affiliates (as defined below);

(b)      except as permitted by the Lender in writing, sell, encumber (except with respect to Lender) or otherwise transfer or dispose of all or substantially all of the properties of the Corporation (a sale or disposition will be deemed to be "all or substantially all of the properties of the Corporation" if the total value of the properties sold or disposed of in such transaction and during the twelve months preceding such transaction is sixty six and two thirds percent (66-2/3%) or more in value of the Corporation's total assets as of the end of the most recently completed corporate fiscal year);

(c)      to the fullest extent permitted by law, dissolve, wind up or liquidate the Corporation;

(d)      merge, consolidate or acquire all or substantially all of the assets of an Affiliate of same or other person or entity;

(e)      change the nature of the business of the Corporation; or

(f)      except as permitted by the Lender in writing, amend, modify or otherwise change these Articles of Incorporation (or, after securitization of the Loan, only if the Corporation receives (i) confirmation from each of the applicable rating agencies that such amendment, modification or change would not result in the qualification, withdrawal or downgrade of any securities rating and (ii) permission of the Lender in writing).

4.      The Corporation shall not, and no person or entity on behalf of the Corporation shall, either with respect to itself or the Company, without the prior written affirmative vote of one hundred percent (100%) of the Board of Directors: (a) institute proceedings to be adjudicated bankrupt or insolvent; (b) consent to the institution of bankruptcy or insolvency proceedings against it or the Company; (c) file a petition seeking, or consenting to, reorganization or relief under any applicable federal or state law relating to bankruptcy; (d) consent to the appointment of

a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Corporation or the Company or a substantial part of their respective property; (e) make any assignment for the benefit of creditors; (f) admit in writing its or the Company's inability to pay their respective debts generally as they become due or declare or effect a moratorium on its or the Company's respective debts; or (g) take any corporate action in furtherance of any such action.

5.    The Corporation shall have no indebtedness or incur any liability other than (a) unsecured debts and liabilities for trade payables and accrued expenses incurred in the ordinary course of its business, provided, however, that such unsecured indebtedness or liabilities (i) are in amounts that are normal and reasonable under the circumstances, but in no event to exceed in the aggregate two percent (2%) of the original principal amount of the Loan and (ii) are not evidenced by a note and are paid when due, but in no event for more than sixty (60) days from the date that such indebtedness or liabilities are incurred and (b) the Loan.  No indebtedness of the Corporation shall be secured.

6.    The Corporation shall at times observe the applicable legal requirements for the recognition of the Corporation as a legal entity separate from any Affiliates of same, including, without limitation, as follows:

(a)    The Corporation shall maintain its principal executive office and telephone and facsimile numbers separate from that of any Affiliate of same and shall conspicuously identify such office and numbers as its own or shall allocate by written agreement fairly and reasonably any rent, overhead and expenses for shared office space. Additionally, the Corporation shall use its own separate stationery, invoices and checks which reflects its separate address, telephone number and facsimile number.

(b)    The Corporation shall maintain correct and complete financial statements, accounts, books and records and other entity documents separate from those of any Affiliate or any other person or entity. The Corporation shall prepare unaudited quarterly and annual financial statements, and the Corporation's financial statements shall substantially comply with generally accepted accounting principles.

(c)    The Corporation shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account.

(d)    The Corporation shall file or cause to be filed its own separate tax returns.

(e)    The Corporation shall hold itself out to the public (including any of its Affiliates' creditors) under the Corporation's own name and as a separate and distinct corporate entity and not as a department, division or otherwise of any Affiliate of same.

(f)    The Corporation shall observe all customary formalities regarding the corporate existence of the Corporation, including holding meetings and maintaining current and accurate minute books separate from those of any Affiliate of same.

(g)    The Corporation shall hold title to its assets in its own name and act solely in its own name and through its own duly authorized officers and agents.  No Affiliate of

same shall be appointed or act as agent of the Corporation, other than, as applicable, a property manager with respect to the property owned by the Company.

(h)     Investments shall be made in the name of the Corporation directly by the Corporation or on its behalf by brokers engaged and paid by the Corporation or its agents.

(i)     Except as required by Lender, the Corporation shall not guarantee, pledge or assume or hold itself out or permit itself to be held out as having guaranteed, pledged or assumed any liabilities or obligations of any Affiliate of the Corporation, nor shall it make any loan, except as permitted in the loan agreement with the Lender.

(j)     The Corporation is and will be solvent.

(k)     Assets of the Corporation shall be separately identified, maintained and segregated. The Corporation's assets shall at all times be held by or on behalf of the Corporation and if held on behalf of the Corporation by another entity, shall at all times be kept identifiable (in accordance with customary usages) as assets owned by the Corporation. This restriction requires, among other things, that (i) Corporation funds shall be deposited or invested in the Corporation's name, (ii) Corporation funds shall not be commingled with the funds of any Affiliate of same or other person or entity, (iii) the Corporation shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliate of same or other person or entity, and (iv) Corporation funds shall be used for the business of the Corporation.

(l)     The Corporation shall maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate of same or other person or entity.

(m)     The Corporation shall pay or cause to be paid its own liabilities and expenses of any kind, including but not limited to salaries of its employees, only out of its own separate funds and assets.

(n)     The Corporation shall at all times be adequately capitalized to engage in the transactions contemplated at its formation.

(o)     The Corporation shall not do any act which would make it impossible to carry on the ordinary business of the Corporation.

(p)     All data and records (including computer records) used by the Corporation or any Affiliate of same in the collection and administration of any loan shall reflect the Corporation's ownership interest therein.

(q)     None of the Corporation's funds shall be invested in securities issued by, nor shall the Corporation acquire the indebtedness or obligation of, any Affiliate of same.

(r)     The Corporation shall maintain an arm's length relationship with each of its Affiliates and enter into contracts or transact business with its Affiliates only on

commercially reasonable terms that are no less favorable to the Corporation than is obtainable in the market from a person or entity that is not an Affiliate of same.

(s)     The Corporation shall correct any misunderstanding that is known by the Corporation regarding its name or separate identity.

For purposes of these Articles of Incorporation, Affiliate means any person or entity, including, but not limited to, the Company, which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a specified person or entity. For purposes hereof, the terms "control", "controlled", or "controlling" with respect to a specified person or entity shall include, without limitation, (i) the ownership, control or power to vote ten percent (10%) or more of (x) the outstanding shares of any class of voting securities or (y) beneficial interests, of any such person or entity, as the case may be, directly or indirectly, or acting through one or more persons or entities, (ii) the control in any manner over the shareholder(s) or the election of more than one director or trustee (or persons exercising similar functions) of such person or entity, or (iii) the power to exercise, directly or indirectly, control over the management or policies of such person or entity.

7.     Any indemnification obligation of the Corporation shall (a) be fully subordinated to the Loan and (b) not constitute a claim against the Corporation or its assets until such time as the Loan has been indefeasibly paid in accordance with its terms and otherwise has been fully discharged.

## ARTICLE SEVEN

The number of directors shall be fixed by, or in the manner provided in, the bylaws of the corporation.

## ARTICLE EIGHT

The power to make, alter, amend, or repeal bylaws of the corporation shall be vested exclusively in the Board of Directors.

## ARTICLE NINE

No member of the Board of Directors of the Corporation shall be personally liable to the Corporation or its shareholders for monetary damages for any breach of fiduciary duty to the Corporation or its shareholders as a director, provided, however, that this Article Eleven shall not limit such liability of a member of the Board of Directors (i) for any breach of such member's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in subjective good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to section 351.345 of The General and Business Corporation Law of Missouri, or (iv) for any transaction from which the member derived an improper personal benefit.

2171614.01

**ARTICLE TEN**

No holder of shares of any class of stock of this corporation, either now or hereafter authorized or issued, shall have any preemptive or preferential right to subscribe for or purchase any shares of any class of stock of this corporation, either now or hereafter authorized whether issued for cash, property or services, or to subscribe for or purchase obligations, bonds, notes, debentures, other securities or stock convertible into stock of any class of this corporation, other than such right, if any, as the Board of Directors in its discretion may from time to time determine, and at such prices as the Board of Directors may from time to time fix.

**ARTICLE ELEVEN**

No shareholder shall have the right to cumulative voting in the election of directors.

IN AFFIRMATION THEREOF, the facts stated above are true and correct. These Articles of Incorporation are hereby executed as of this ___14th___ day of October, 2005.

(The undersigned understands that false statements made in this filing are subject to the penalties provided under Section 575.040, RSMo)

Stacy E. Wipfler

# State of Missouri



### Robin Carnahan
### Secretary of State

CERTIFICATE OF INCORPORATION

WHEREAS, Articles of Incorporation of

*NWJ Kansas City, Inc.*
*00691586*

have been received and filed in the Office of the Secretary of State, which Articles, in all respects, comply with the requirements of General and Business Corporation Law.

NOW, THEREFORE, I, ROBIN CARNAHAN, Secretary of State of the State of Missouri, do by virtue of the authority vested in me by law, do hereby certify and declare this entity a body corporate, duly organized this date and that it is entitled to all rights and privileges granted corporations organized under the General and Business Corporation Law.

IN TESTIMONY WHEREOF, I have set my hand and imprinted the GREAT SEAL of the State of Missouri, on this, the 14th day of October, 2005.



_____
Secretary of State



# State of Missouri

## Robin Carnahan
### Secretary of State

CERTIFICATE OF INCORPORATION

WHEREAS, Articles of Incorporation of

ANNI Kansas City, Inc.
0983236

have been received and filed in the Office of the Secretary of State, which Articles, in all respects, comply with the requirements of General and Business Corporation Law.

NOW, THEREFORE, I, ROBIN CARNAHAN, Secretary of State of the State of Missouri, by virtue of the authority vested in me by law, do hereby certify and declare this entity a body corporate, duly organized this date and entitled to all rights and privileges granted domestic corporations under the General and Business Corporation Law.

IN TESTIMONY WHEREOF, I have set my hand and imprinted the GREAT SEAL of the State of Missouri on this date.



# EXHIBIT "6"

## ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTERESTS (KANSAS CITY EQUITIES L.L.C.)

This Assignment and Assumption of Membership Interests (this "Assignment") is made as of the 𝒱𝒴 day of October, 2005 by and between **NICKOLAS W. JEKOGIAN, III**, an individual, **LUIS A. COZZA**, an individual, and **FERNANDO COZZA**, an individual, each having an address at c/o NWJ Companies, 1600 Market Street, Suite 1410, Philadelphia, Pennsylvania 19103 (collectively, "Assignor") and **NWJ KANSAS CITY, INC.**, a Missouri corporation, having an address at c/o NWJ Companies, 1600 Market Street, Suite 1410, Philadelphia, Pennsylvania 19103 ("Assignee").

## W I T N E S S E T H :

**WHEREAS**, each Assignor has agreed to transfer, assign and convey the applicable percentage set forth on Exhibit A annexed hereto of each Assignor's right, title and interest (the "Membership Interests") in and to Kansas City Equities, L.L.C., a Missouri limited liability company (the "LLC") to Assignee and Assignee has agreed to accept such assignment and assume all of such Assignor's obligations and liabilities with respect to the Membership Interests under that certain Operating Agreement of LLC dated December 13, 2002 (the "Obligations and Liabilities") from and after the date hereof, subject to the terms of this Assignment.

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.     Assignor hereby transfers, assigns and conveys the Membership Interests to Assignee.

2.     Assignee hereby accepts such assignment and assumes the Obligations and Liabilities from and after the date hereof.

3.     THIS AGREEMENT AND ANY MATTER RELATED HERETO IS TO BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MISSOURI.

4.     This Assignment may not be modified, altered or amended, or its terms waived, except by an instrument in writing signed by the parties hereto.

5.     None of the provisions of this Assignment are intended to be, nor shall they construed to be, for the benefit of any third party.

6.     This Assignment may be executed in counterparts all of which taken together shall constitute one original assignment.

118293.00404/6431467v.1

      7.      If any provision of this Assignment is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination will not effect the remaining provisions of this Assignment, all of which will remain in full force and effect.

**[SIGNATURES ON FOLLOWING PAGE]**

B-4/2

**IN WITNESS WHEREOF,** Assignor and Assignee have executed and delivered this Assignment as of the date first above written.

ASSIGNOR:

NICKOLAS W. JEKOGIAN, III

LUIS A. COZZA

FERNANDO COZZA

ASSIGNEE:

NWJ KANSAS CITY, INC.

By:

Nickolas W. Jekogian, III, President

118293.00404/6431467v.1

FROM :    NWJ MANAGEMENT          FAX NO. :18123369997          Oct. 18 2005 11:19AM P8

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the date first above written.

ASSIGNOR:

NICKOLAS W. JEKOGIAN, III

LUIS A. COZZA

FERNANDO COZZA

ASSIGNEE:

NWJ KANSAS CITY, INC.

By:_____
          Nickolas W. Jekogian, III, President

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the date first above written.

ASSIGNOR:

_____
NICKOLAS W. JEKOGIAN, III

_____
LUIS A. COZZA

_____
FERNANDO COZZA

ASSIGNEE:

NWJ KANSAS CITY, INC.

By:_____
      Nickolas W. Jekogian, III, President

# EXHIBIT "7"

# FIRST AMENDMENT TO THE OPERATING AGREEMENT
# OF KANSAS CITY EQUITIES L.L.C.

This First Amendment ("Amendment") to the Operating Agreement of Kansas City Equities L.L.C., a Missouri limited liability company (the "Company"), is entered into this 20th day of October, 2005 by and among the undersigned, representing all of the members of the Company (the "Members").

## BACKGROUND

A.     The Members entered into an Operating Agreement for the Company dated December 13, 2002 (the "Agreement").

B      The Members desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.     The following shall replace Section 2 of the Agreement:

### SECTION 2. MEMBERS

(2.1)   The Members shall be Nickolas W. Jekogian, III, Luis A. Cozza, Fernando Cozza and NWJ Kansas City, Inc.  NWJ Kansas City, Inc. shall be the "Managing Member."

(2.2)   Each Member's percentage interest in the Company's capital and income (the "Company Interest") shall be as set forth below:

| Name | Interest | Title |
| --- | --- | --- |
| Nickolas W. Jekogian | 33.00% | Member |
| Luis A. Cozza | 33.00% | Member |
| Fernando Cozza | 33.00 % | Member |
| NWJ Kansas City, Inc. | 1% | Managing Member |

(2.3)      Whenever any voting is to take place under this Agreement, each Member shall have the number of votes equal to such Member's Company Interest."

118293.00404/6429345v.4

2.    The following shall replace Section 5.1 of the Agreement:

(5.1)   Each Member, upon execution of this Agreement, shall contribute to the Company, as such Member's initial capital contribution, the sum set forth below:

| Name | Capital Contribution |
| --- | --- |
| Nickolas W. Jekogian, III | $333.00 |
| Luis A. Cozza | $333.00 |
| Fernando Cozza | $333.00 |
| NWJ Kansas City Inc | $10.00 |

3.    The following new Section 18 is hereby added to the Agreement:

### "SECTION 18: SINGLE PURPOSE ENTITY

Notwithstanding any other provision of this Agreement, any other organizational documents or any provisions of law that empowers Kansas City Equities L.L.C. (the "Company"), the following provisions shall be operative and controlling so long as the loan (the "Loan") by Prudential Mortgage Capital Company, LLC or its successors and/or assigns (collectively, the "Lender") to the Company, Nicks Properties, L.L.C. and Plaza Property Group, L.L.C. is outstanding:

1.    The sole purpose of the Company is to acquire, own, hold, maintain, and operate the properties listed on Exhibit A annexed hereto, which are each mortgaged as collateral for the Loan (collectively, the "Property"), together with such other activities as may be necessary or advisable in connection with the ownership of the Property.   The Company shall not engage in any business, and it shall have no purpose, unrelated to the Property and shall not acquire any real property or own assets other than those related to the Property and/or otherwise in furtherance of the limited purposes of the Company.

2.    NWJ Kansas City, Inc. is designated as the sole managing member of the Company (the "Managing Member").  For avoidance of doubt, Luis A. Cozza and Nickolas W. Jekogian are no longer Managing Members of the Company, but each remains a Member of the Company.

3.    The Managing Member shall have no authority to perform any act in respect of the Company in violation of any (a) applicable laws or regulations or (b) any agreement between the Company and the Lender.

4.    The Company shall not:

(a)     make any loans to the Managing Member or other members of the Company (individually, a "Member" and collectively with the Managing Member, the "Members") or the Company's or any Member's Affiliates (as defined below);

(b)     except as permitted by the Lender in writing, sell, encumber (except with respect to the Lender) or otherwise transfer or dispose of all or substantially all of the properties of the Company (a sale or disposition will be deemed to be "all or substantially all of the properties of the Company" if the sale or disposition includes the Property or if the total value of the properties sold or disposed of in such transaction and during the twelve months preceding such transaction is sixty six and two thirds percent (66-2/3%) or more in value of the Company's total assets as of the end of the most recently completed Company fiscal year);

(c)     to the fullest extent permitted by law, dissolve, wind-up, or liquidate the Company;

(d)     merge, consolidate or acquire all or substantially all of the assets of an Affiliate of same or other person or entity;

(e)     change the nature of the business conducted by the Company; or

(f)     except as permitted by the Lender in writing, amend, modify or otherwise change this Agreement (or, after securitization of the Loan, only if the Company receives (i) confirmation from each of the applicable rating agencies that such amendment, modification or change would not result in the qualification, withdrawal or downgrade of any securities rating and (ii) permission of the Lender in writing).

5.     The Company shall not, and no Member or other person or entity on behalf of the Company shall, without the prior written affirmative vote of one hundred percent (100%) of the Members: (a) institute proceedings to be adjudicated bankrupt or insolvent; (b) consent to the institution of bankruptcy or insolvency proceedings against it; (c) file a petition seeking, or consenting to, reorganization or relief under any applicable federal or state law relating to bankruptcy; (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property; (e) make any assignment for the benefit of creditors; (f) admit in writing its inability to pay its debts generally as they become due or declare or effect a moratorium on its debts; or (g) take any action in furtherance of any such action ((a) through (g) above, with respect to any person or entity,

collectively, a "Bankruptcy Action").

6.     The Company shall have no indebtedness or incur any liability other than (a) unsecured debts and liabilities for trade payables and accrued expenses incurred in the ordinary course of its business of operating the Property, provided, however, that such unsecured indebtedness or liabilities (i) are in amounts that are normal and reasonable under the circumstances, but in no event to exceed in the aggregate two percent (2%) of the original principal amount of the Loan and (ii) are not evidenced by a note and are paid when due, but in no event for more than sixty (60) days from the date that such indebtedness or liabilities are incurred and (b) the Loan.  No indebtedness other than the Loan shall be secured (senior, subordinated or <u>pari passu</u>) by the Property. In furtherance thereof, Section 6.1 of the Agreement shall not apply for so long as the Loan is outstanding.

7.     A Bankruptcy Action by or against any Member shall not cause such Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.  Additionally, to the fullest extent permitted by law, if any Member ceases to be a member of the Company such event shall not terminate the Company and the Company shall continue without dissolution.

8.     The Company shall at all times observe the applicable legal requirements for the recognition of the Company as a legal entity separate from any Members or Affiliates of same, including, without limitation, as follows:

(a)     The Company shall allocate by written agreement fairly and reasonably any rent, overhead and expenses for shared office space.   Additionally, the Company shall use its own separate stationery, invoices and checks.

(b)     The Company shall maintain correct and complete financial statements, accounts, books and records and other entity documents separate from those of any Affiliate of same or any other person or entity.   The Company shall prepare unaudited quarterly and annual financial statements, and the Company's financial statements shall substantially comply with generally accepted accounting principles.

(c)     The Company shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account.

(d)     The Company shall file or cause to be filed its own

separate tax returns.

(e)    The Company shall hold itself out to the public (including any of its Affiliates' creditors) under the Company's own name and as a separate and distinct entity and not as a department, division or otherwise of any Affiliate of same.

(f)    The Company shall observe all customary formalities regarding the existence of the Company, including holding meetings and maintaining current and accurate minute books separate from those of any Affiliate of same.

(g)    The Company shall hold title to its assets in its own name and act solely in its own name and through its own duly authorized officers and agents.  No Affiliate of same shall be appointed or act as agent of the Company, other than, as applicable, a property manager with respect to the Property.

(h)    Investments shall be made in the name of the Company directly by the Company or on its behalf by brokers engaged and paid by the Company or its agents.

(i)    Except as required by Lender, the Company shall not guarantee, pledge or assume or hold itself out or permit itself to be held out as having guaranteed, pledged or assumed any liabilities or obligations of any Member or any Affiliate of the Company, nor shall it make any loan, except as permitted in the loan agreement with the Lender.

(j)    The Company is and will be solvent.

(k)    Assets of the Company shall be separately identified, maintained and segregated.  The Company's assets shall at all times be held by or on behalf of the Company and if held on behalf of the Company by another entity, shall at all times be kept identifiable (in accordance with customary usages) as assets owned by the Company.  This restriction requires, among other things, that (i) Company funds shall be deposited or invested in the Company's name, (ii) Company funds shall not be commingled with the funds of any Affiliate of same or other person or entity, (iii) the Company shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliate of same or other person or entity, and (iv) Company funds shall be used only for the business of the Company.

(l)    The Company shall maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or

identify its individual assets from those of any Affiliate of same or other person or entity.

(m)   The Company shall pay or cause to be paid its own liabilities and expenses of any kind, including but not limited to salaries of its employees, only out of its own separate funds and assets.

(n)   The Company shall at all times be adequately capitalized to engage in the transactions contemplated at its formation.

(o)   The Company shall not do any act which would make it impossible to carry on the ordinary business of the Company.

(p)   All data and records (including computer records) used by the Company or any Affiliate of same in the collection and administration of any loan shall reflect the Company's ownership interest therein.

(q)   None of the Company's funds shall be invested in securities issued by, nor shall the Company acquire the indebtedness or obligation of, any Affiliate of same.

(r)   The Company shall maintain an arm's length relationship with each of its Affiliates and may enter into contracts or transact business with its Affiliates only on commercially reasonable terms that are no less favorable to the Company than is obtainable in the market from a person or entity that is not an Affiliate of same.

(s)   The Company shall correct any misunderstanding that is known by the Company regarding its name or separate identity.

For purposes of this Agreement, Affiliate means any person or entity which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a specified person or entity.  For purposes hereof, the terms "control", "controlled", or "controlling" with respect to a specified person or entity shall include, without limitation, (i) the ownership, control or power to vote ten percent (10%) or more of (x) the outstanding shares of any class of voting securities or (y) beneficial interests, of any such person or entity, as the case may be, directly or indirectly, or acting through one or more persons or entities, (ii) the control in any manner over the managing member(s) or the election of more than one director or trustee (or persons exercising similar functions) of such person or entity, or (iii) the power to exercise,

directly or indirectly, control over the management or policies of such person or entity.

9.      Any indemnification obligation of the Company shall (a) be fully subordinated to the Loan and (b) not constitute a claim against the Company or its assets until such time as the Loan has been indefeasibly paid in accordance with its terms and otherwise has been fully discharged.

4.      The following shall replace 1.4 of the Agreement:

(1.4)   The business of the Company shall be conducted under the name Kansas City Equities L.L.C.

5.      This Amendment shall be binding upon, and inure to the benefit of, the parties hereto and their respective legal representatives, heirs, successors and assigns.

6.      This Amendment may be executed in one or more counterparts with the same effect as if all the Members had signed the same document.  All counterparts shall constitute one and the same instrument.

[Signatures on the Following Page]

IN WITNESS WHEREOF, we set our hands and seals this _26_ day of October, 2005.

_____
Nickolas W. Jekogian, III


_____
Luis A. Cozza


_____
Fernando Cozza

NWJ KANSAS CITY, INC.

By: _____
Name:
**Title**

118293.00404/6429345v.4

IN WITNESS WHEREOF, we set our hands and seals this _10_ day of October, 2005.

Nickolas W. Jekogian, III
_____

Luis A. Cozza
_____

Fernando Cozza
_____

IN WITNESS WHEREOF, we set our hands and seals this 20 day of October, 2005.

_____
Nickolas W. Jekogian, III


_____
Luis A. Cozza


_____
Fernando Cozza

NWJ KANSAS CITY, INC.

By:_____
　　　　Name:
　　　　Title

**EXHIBIT A**

PROPERTIES

1.   4545 Main Street, Kansas City, Missouri.

2.   4400 Jarboe Street, Kansas City, Missouri.

3.   4033 Oak Street, Kansas City, Missouri.

118293.00404/6429345v.4

# EXHIBIT "8"

## ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTERESTS (PLAZA PROPERTY GROUP, L.L.C.)

This Assignment and Assumption of Membership Interests (this "Assignment") is made as of the ___ day of October, 2005 by and between **NICKOLAS W. JEKOGIAN, III**, an individual, **LUIS A. COZZA**, an individual, and **FERNANDO COZZA**, an individual, each having an address at c/o NWJ Companies, 1600 Market Street, Suite 1410, Philadelphia, Pennsylvania 19103 (collectively, "Assignor") and **NWJ KANSAS CITY, INC.**, a Missouri corporation, having an address at c/o NWJ Companies, 1600 Market Street, Suite 1410, Philadelphia, Pennsylvania 19103 ("Assignee").

### W I T N E S S E T H :

**WHEREAS**, each Assignor has agreed to transfer, assign and convey the applicable percentage set forth on Exhibit A annexed hereto of each Assignor's right, title and interest (the "Membership Interests") in and to Plaza Property Group, L.L.C., a Missouri limited liability company (the "LLC") to Assignee and Assignee has agreed to accept such assignment and assume all of such Assignor's obligations and liabilities with respect to the Membership Interests under that certain Operating Agreement of LLC dated October 3, 2003 (the "Obligations and Liabilities") from and after the date hereof, subject to the terms of this Assignment.

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignor hereby transfers, assigns and conveys the Membership Interests to Assignee.

2.      Assignee hereby accepts such assignment and assumes the Obligations and Liabilities from and after the date hereof.

3.      THIS AGREEMENT AND ANY MATTER RELATED HERETO IS TO BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MISSOURI.

4.      This Assignment may not be modified, altered or amended, or its terms waived, except by an instrument in writing signed by the parties hereto.

5.      None of the provisions of this Assignment are intended to be, nor shall they construed to be, for the benefit of any third party.

6.      This Assignment may be executed in counterparts all of which taken together shall constitute one original assignment.

118293.00404/6431457v.2

7.     If any provision of this Assignment is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination will not effect the remaining provisions of this Assignment, all of which will remain in full force and effect.

**[SIGNATURES ON FOLLOWING PAGE]**

B-4/2

118293.00404/6431457v.2

**IN WITNESS WHEREOF**, Assignor and Assignee have executed and delivered this Assignment as of the date first above written.

ASSIGNOR:

NICKOLAS W. JEKOGIAN, III

LUIS A. COZZA

FERNANDO COZZA

ASSIGNEE:

NWJ KANSAS CITY, INC.

By:

Nickolas W. Jekogian, III, President

118293.00404/6431457v.2

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the date first above written.

**ASSIGNOR:**

NICKOLAS W. JEKOGIAN, III

TITLE A COENT

FERNANDO COZZA

**ASSIGNEE:**

NWJ KANSAS CITY, INC.

By:

Nickolas W. Jekogian, III, President

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the date first above written.

ASSIGNOR:

_____

NICKOLAS W. JEKOGIAN, III

_____

LUIS A. COZZA

_____

FERNANDO COZZA

ASSIGNEE:

NWJ KANSAS CITY, INC.

By:_____

      Nickolas W. Jekogian, III, President

## EXHIBIT A

| Assignor | Percentage Assigned |
|---|---|
| 1. Nickolas W. Jekogian, III | .0188% |
| 2. Luis A. Cozza | .4060% |
| 3. Fernando Cozza | .4060% |
| | |
| **Total Assigned:** | **1.00%** |

118293.00404/6431457v.2

# EXHIBIT "9"

## FIRST AMENDMENT TO THE OPERATING AGREEMENT
## OF PLAZA PROPERTY GROUP, L.L.C.

This First Amendment ("Amendment") to the Operating Agreement of Plaza Property Group, L.L.C., a Missouri limited liability company (the "Company"), is entered into this 7th day of October, 2005 by and among the undersigned, representing all of the members of the Company (the "Members").

### BACKGROUND

A.     The Members entered into an Operating Agreement for the Company dated October 3, 2003 (the "Agreement").

B      The Members desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.     The following shall replace Section 2 of the Agreement:

### SECTION 2. MEMBERS

(2.1)   The Members shall be Nickolas W. Jekogian, III, Luis A. Cozza, Fernando Cozza and NWJ Kansas City Inc.  NWJ Kansas City, Inc. shall be the "Managing Member."

(2.2)   Each Member's percentage interest in the Company's capital and income (the "Company Interest") shall be as set forth below:

| Name | Interest | Title |
| --- | --- | --- |
| Nickolas W. Jekogian | 18.610% | Member |
| Luis A. Cozza | 40.195% | Member |
| Fernando Cozza | 40.195% | Member |
| NWJ Kansas City, Inc. | 1% | Managing Member |

(2.3)       Whenever any voting is to take place under this Agreement, each Member shall have the number of votes equal to such Member's Company Interest."

118293.00404/6429368v.4

2.     The following shall replace Section 5.1 of the Agreement:

(5.1)   Each Member, upon execution of this Agreement, shall contribute to the Company, as such Member's initial capital contribution, the sum set forth below:

| Name | Capital Contribution |
|------|---------------------|
| Nickolas W. Jekogian, III | $186.10 |
| Luis A. Cozza | $401.95 |
| Fernando Cozza | $401.95 |
| NWJ Kansas City, Inc. | $10.00 |

3.     The following new Section 18 is hereby added to the Agreement:

## "SECTION 18: SINGLE PURPOSE ENTITY

Notwithstanding any other provision of this Agreement, any other organizational documents or any provisions of law that empowers Plaza Property Group, L.L.C. (the "Company"), the following provisions shall be operative and controlling so long as the loan (the "Loan") by Prudential Mortgage Capital Company, LLC or its successors and/or assigns (collectively, the "Lender") to the Company, Nicks Properties, L.L.C. and Kansas City Equities L.L.C., is outstanding:

1.     The sole purpose of the Company is to acquire, own, hold, maintain, and operate the properties listed on Exhibit A annexed hereto, which are each mortgaged as collateral for the Loan (collectively, the "Property"), together with such other activities as may be necessary or advisable in connection with the ownership of the Property.   The Company shall not engage in any business, and it shall have no purpose, unrelated to the Property and shall not acquire any real property or own assets other than those related to the Property and/or otherwise in furtherance of the limited purposes of the Company.

2.     NWJ Kansas City, Inc. is designated as the sole managing member of the Company (the "Managing Member").   For avoidance of doubt, Nickolas W. Jekogian, III is no longer a Managing Member of the Company, but remains a Member of the Company.

3.     The Managing Member shall have no authority to perform any act in respect of the Company in violation of any (a) applicable laws or regulations or (b) any agreement between the Company and the Lender.

4.     The Company shall not:

118293.00404/6429368v.4

(a)     make any loans to the Managing Member or other members of the Company (individually, a "Member" and collectively with the Managing Member, the "Members") or the Company's or any Member's Affiliates (as defined below);

(b)     except as permitted by the Lender in writing, sell, encumber (except with respect to the Lender) or otherwise transfer or dispose of all or substantially all of the properties of the Company (a sale or disposition will be deemed to be "all or substantially all of the properties of the Company" if the sale or disposition includes the Property or if the total value of the properties sold or disposed of in such transaction and during the twelve months preceding such transaction is sixty six and two thirds percent (66-2/3%) or more in value of the Company's total assets as of the end of the most recently completed Company fiscal year);

(c)     to the fullest extent permitted by law, dissolve, wind-up, or liquidate the Company;

(d)     merge, consolidate or acquire all or substantially all of the assets of an Affiliate of same or other person or entity;

(e)     change the nature of the business conducted by the Company; or

(f)     except as permitted by the Lender in writing, amend, modify or otherwise change this Agreement (or, after securitization of the Loan, only if the Company receives (i) confirmation from each of the applicable rating agencies that such amendment, modification or change would not result in the qualification, withdrawal or downgrade of any securities rating and (ii) permission of the Lender in writing).

5.     The Company shall not, and no Member or other person or entity on behalf of the Company shall, without the prior written affirmative vote of one hundred percent (100%) of the Members: (a) institute proceedings to be adjudicated bankrupt or insolvent; (b) consent to the institution of bankruptcy or insolvency proceedings against it; (c) file a petition seeking, or consenting to, reorganization or relief under any applicable federal or state law relating to bankruptcy; (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property; (e) make any assignment for the benefit of creditors; (f) admit in writing its inability to pay its debts generally as they become due or declare or effect a moratorium on its debts; or (g) take any action in furtherance of any such action ((a) through (g) above, with respect to any person or entity,

118293.00404/6429368v.4

collectively, a "Bankruptcy Action").

6.      The Company shall have no indebtedness or incur any liability other than (a) unsecured debts and liabilities for trade payables and accrued expenses incurred in the ordinary course of its business of operating the Property, provided, however, that such unsecured indebtedness or liabilities (i) are in amounts that are normal and reasonable under the circumstances, but in no event to exceed in the aggregate two percent (2%) of the original principal amount of the Loan and (ii) are not evidenced by a note and are paid when due, but in no event for more than sixty (60) days from the date that such indebtedness or liabilities are incurred and (b) the Loan.  No indebtedness other than the Loan shall be secured (senior, subordinated or pari passu) by the Property. In furtherance thereof, Section 6.1 of the Agreement shall not apply for so long as the Loan is outstanding.

7.      A Bankruptcy Action by or against any Member shall not cause such Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.  Additionally, to the fullest extent permitted by law, if any Member ceases to be a member of the Company such event shall not terminate the Company and the Company shall continue without dissolution.

8.      The Company shall at all times observe the applicable legal requirements for the recognition of the Company as a legal entity separate from any Members or Affiliates of same, including, without limitation, as follows:

        (a)      The Company shall allocate by written agreement fairly and reasonably any rent, overhead and expenses for shared office space.   Additionally, the Company shall use its own separate stationery, invoices and checks.

        (b)      The Company shall maintain correct and complete financial statements, accounts, books and records and other entity documents separate from those of any Affiliate of same or any other person or entity.  The Company shall prepare unaudited quarterly and annual financial statements, and the Company's financial statements shall substantially comply with generally accepted accounting principles.

        (c)      The Company shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account.

        (d)      The Company shall file or cause to be filed its own

118293.00404/6429368v.4

separate tax returns.

(e)     The Company shall hold itself out to the public (including any of its Affiliates' creditors) under the Company's own name and as a separate and distinct entity and not as a department, division or otherwise of any Affiliate of same.

(f)     The Company shall observe all customary formalities regarding the existence of the Company, including holding meetings and maintaining current and accurate minute books separate from those of any Affiliate of same.

(g)     The Company shall hold title to its assets in its own name and act solely in its own name and through its own duly authorized officers and agents.  No Affiliate of same shall be appointed or act as agent of the Company, other than, as applicable, a property manager with respect to the Property.

(h)     Investments shall be made in the name of the Company directly by the Company or on its behalf by brokers engaged and paid by the Company or its agents.

(i)     Except as required by Lender, the Company shall not guarantee, pledge or assume or hold itself out or permit itself to be held out as having guaranteed, pledged or assumed any liabilities or obligations of any Member or any Affiliate of the Company, nor shall it make any loan, except as permitted in the loan agreement with the Lender.

(j)     The Company is and will be solvent.

(k)     Assets of the Company shall be separately identified, maintained and segregated.  The Company's assets shall at all times be held by or on behalf of the Company and if held on behalf of the Company by another entity, shall at all times be kept identifiable (in accordance with customary usages) as assets owned by the Company.  This restriction requires, among other things, that (i) Company funds shall be deposited or invested in the Company's name, (ii) Company funds shall not be commingled with the funds of any Affiliate of same or other person or entity, (iii) the Company shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliate of same or other person or entity, and (iv) Company funds shall be used only for the business of the Company.

(l)     The Company shall maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or

identify its individual assets from those of any Affiliate of same or other person or entity.

(m)     The Company shall pay or cause to be paid its own liabilities and expenses of any kind, including but not limited to salaries of its employees, only out of its own separate funds and assets.

(n)     The Company shall at all times be adequately capitalized to engage in the transactions contemplated at its formation.

(o)     The Company shall not do any act which would make it impossible to carry on the ordinary business of the Company.

(p)     All data and records (including computer records) used by the Company or any Affiliate of same in the collection and administration of any loan shall reflect the Company's ownership interest therein.

(q)     None of the Company's funds shall be invested in securities issued by, nor shall the Company acquire the indebtedness or obligation of, any Affiliate of same.

(r)     The Company shall maintain an arm's length relationship with each of its Affiliates and may enter into contracts or transact business with its Affiliates only on commercially reasonable terms that are no less favorable to the Company than is obtainable in the market from a person or entity that is not an Affiliate of same.

(s)     The Company shall correct any misunderstanding that is known by the Company regarding its name or separate identity.

For purposes of this Agreement, Affiliate means any person or entity which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a specified person or entity. For purposes hereof, the terms "control", "controlled", or "controlling" with respect to a specified person or entity shall include, without limitation, (i) the ownership, control or power to vote ten percent (10%) or more of (x) the outstanding shares of any class of voting securities or (y) beneficial interests, of any such person or entity, as the case may be, directly or indirectly, or acting through one or more persons or entities, (ii) the control in any manner over the managing member(s) or the election of more than one director or trustee (or persons exercising similar functions) of such person or entity, or (iii) the power to exercise,

directly or indirectly, control over the management or policies of such person or entity.

9.      Any indemnification obligation of the Company shall (a) be fully subordinated to the Loan and (b) not constitute a claim against the Company or its assets until such time as the Loan has been indefeasibly paid in accordance with its terms and otherwise has been fully discharged.

4.      This Amendment shall be binding upon, and inure to the benefit of, the parties hereto and their respective legal representatives, heirs, successors and assigns.

5.      This Amendment may be executed in one or more counterparts with the same effect as if all the Members had signed the same document.  All counterparts shall constitute one and the same instrument.

[Signatures on the Following Page]

IN WITNESS WHEREOF, we set our hands and seals this _10_ day of October, 2005.

_____
Nickolas W. Jekogian, III


_____
Luis A. Cozza


_____
Fernando Cozza

118293.00404/6429368v.4

IN WITNESS WHEREOF, we set our hands and seals this _10_ day of October, 2005.

_____

Nickolas W. Jekogian, III

_____

Luis A. Cozza

_____

Fernando Cozza

FROM :                        FAX NO. :18123369997        Oct. 18 2005 11:18AM P3
          NWJ MANAGEMENT        Fax:2153204854          Oct 18 '05  12:05    P.04

IN WITNESS WHEREOF, we set our hands and seals this $2^D$ day of October, 2005.

_____
Nickolas W. Jekogian, III

_____
Luis A. Cozza

_____
Fernando Cozza

NWJ KANSAS CITY, INC.

By:_____
         Name:
         Title

IN WITNESS WHEREOF, we set our hands and seals this _10_ day of October, 2005.

NWJ KANSAS CITY, INC., a Missouri
corporation

By:_____

      Name:

      Title:

## EXHIBIT A
PROPERTIES

1.  4406-4418 Pennsylvania Avenue, Kansas City, Missouri

2.  209 Brush Creek, Kansas City, Missouri.

3.  4505-4507 Jarboe Street, Kansas City, Missouri.

118293.00404/6429368v.4

# EXHIBIT "10"

# LUNDY, BELDECOS & MILBY, PC

ATTORNEYS AT LAW

STUART R. LUNDY*
ANTHONY J. BELDECOS*
ERIC C. MILBY*
BRENDA GLASER ABRAMS**
DEBORA A. GONZALEZ*
JESSICA M. GULASH*
*PA & NJ
**PA only

EMAIL: EMILBY@LBMLAW.COM
DIRECT LINE: 610-668-0773
DIRECT FAX: 610-675-2780

Please Respond to Narberth Office

November 7, 2014

**VIA CERTIFIED MAIL, RRR**
Plaza Property Group, LLC
CSC-Lawyers Incorporating Service Company
221 Bolivar
Jefferson City, MO 65101

**VIA CERTIFIED MAIL, RRR**
Nickolas W. Jekogian, III
Signature Group Investments
1430 Broadway, Suite 503
New York, NY 10018

Re:    Plaza Property Group, LLC

Dear Mr. Jekogian:

Please be advised that this firm represents Fernando Cozza. As I am sure you are aware, Mr. Cozza is a Member of Plaza Property Group, LLC, a Missouri limited liability company (the "LLC").

The Missouri Limited Liability Company Act, Mo. Ann. Stat. § 347.010 *et seq.* (the "Act"), requires a limited liability company to permit a member to "inspect and copy . . . any of the limited liability company records required to be kept" by the Act. Mo. Ann. Stat. § 347.091 (West). The Act further permits any member to "obtain reasonable true and full information regarding the state of the business and financial condition of the limited liability company" upon reasonable demand. *Id.* Additionally, the Act allows a member to "have an accounting of the affairs of the limited liability company whenever circumstances render it just and reasonable." *Id.*

Pursuant to the Act, please allow this letter to serve as a request that the following documents be provided to Mr. Cozza on or before November 10, 2014:

1.    A copy of the LLC's federal, state, and local income tax returns for the years 2009, 2010, 2011, 2012, and 2013;

---

450 N. Narberth Avenue, Suite 200, Narberth, PA 19072        610-668-0770
525 Route 73 North, Suite 410, Marlton, NJ 08053            856-338-1300

2.      A copy of each and every financial statement of the LLC from 2011 through the present;

3.      A copy of each and every written promise of a member to make a contribution to the LLC from 2002 through the present;

4.      A copy of each and every bank statement including front and back check images for each and every bank account in which funds belonging to the LLC were held at any time from 2002 through the present including, but not limited to, Chase Account No. 000000902950187 and Citibank Account No. 9995797265;

5.      Documentation evidencing each and every transfer in an amount of $5,000.00 or greater from any bank account in which funds belonging to the LLC were held at any time from 2002 through the present including, but not limited to, Chase Account No. 000000902950187 and Citibank Account No. 9995797265;

6.      A copy of each and every document including, but not limited to, cancelled checks and wire or electronic transfer confirmations, evidencing a distribution by the LLC to Mr. Cozza;

7.      An electronic copy of the LLC's financial books and records from 2002 through the present;

8.      A copy of each and every agreement of sale executed for any real property owned by the LLC from 2002 through the present;

9.      A copy of the HUD-1 settlement statement from each and every sale or acquisition of real property by the LLC from 2002 through the present; and

10.     A copy of the rent roll from each and every real property owned by the LLC from 2002 through the present.

Please be advised that the LLC's failure to provide the requested documentation will result in Mr. Cozza pursuing all of his rights and remedies pursuant to the LLC's Operating Agreement and applicable law.

November 5, 2014
Page 3 of 3

Should you wish to discuss this matter, please do not hesitate to contact me.

Very truly yours,

ERIC C. MILBY

**2. Article Number**

717910001649256941142

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

11-2-14

D. Is delivery address different from Item 1?  ☐ Yes
If YES enter delivery address below:  ☐ No

**1. Article Addressed to:**

Plaza Property Group, LLC
CSC-Lawyers Incorporating Service Co
221 Bolivar
Jefferson City, MO 65101

**3. Service Type**   ☒ Certified

**4. Restricted Delivery? (Extra Fee)**   ☐ Yes

PS Form 3811         **Domestic Return Receipt**

---

**2. Article Number**

717910001649256941579

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

Alet Lolm -    11/10/14

D. Is delivery address different from Item 1?  ☐ Yes
If YES enter delivery address below:  ☐ No

**1. Article Addressed to:**

Nickolas W. Jekgian, III
Signature Group Investments
1430 Broadway, Suite 503
New York, NY 10018

**3. Service Type**   ☒ Certified

**4. Restricted Delivery? (Extra Fee)**   ☐ Yes

PS Form 3811         **Domestic Return Receipt**

# EXHIBIT "11"

# LUNDY, BELDECOS & MILBY, PC

## ATTORNEYS AT LAW

STUART R. LUNDY*
ANTHONY J. BELDECOS*
ERIC C. MILBY*
BRENDA GLASER ABRAMS**
DEBORA A. GONZALEZ*
JESSICA M. GULASH*
*PA & NJ
**PA only

EMAIL: EMILBY@LBMLAW.COM
DIRECT LINE: 610-668-0773
DIRECT FAX: 610-675-2780

Please Respond to Narberth Office

November 7, 2014

**VIA CERTIFIED MAIL, RRR**
Kansas City Equities, LLC
CSC-Lawyers Incorporating Service Company
221 Bolivar
Jefferson City, MO 65101

**VIA CERTIFIED MAIL, RRR**
Nickolas W. Jekogian, III
Signature Group Investments
1430 Broadway, Suite 503
New York, NY 10018

Re:   **Kansas City Equities, LLC**

Dear Mr. Jekogian:

Please be advised that this firm represents Fernando Cozza.  As I am sure you are aware, Mr. Cozza is a Member of Kansas City Equities, LLC, a Missouri limited liability company (the "LLC").

The Missouri Limited Liability Company Act, Mo. Ann. Stat. § 347.010 *et seq.* (the "Act"), requires a limited liability company to permit a member to "inspect and copy . . . any of the limited liability company records required to be kept" by the Act.  Mo. Ann. Stat. § 347.091 (West).  The Act further permits any member to "obtain reasonable true and full information regarding the state of the business and financial condition of the limited liability company" upon reasonable demand.  *Id.*  Additionally, the Act allows a member to "have an accounting of the affairs of the limited liability company whenever circumstances render it just and reasonable." *Id.*

Pursuant to the Act, please allow this letter to serve as a request that the following documents be provided to Mr. Cozza on or before November 17, 2014:

1.   A copy of the LLC's federal, state, and local income tax returns for the years 2009, 2010, 2011, 2012, and 2013;

2.   A copy of each and every financial statement of the LLC from 2011 through the present;

3.   A copy of each and every written promise of a member to make a contribution to the LLC from 2002 through the present;

4.   A copy of each and every bank statement including front and back check images for each and every bank account in which funds belonging to the LLC were held at any time from 2002 through the present including, but not limited to, Chase Account No. 000000902950187 and Citibank Account No. 9995797265;

5.   Documentation evidencing each and every transfer in an amount of $5,000.00 or greater from any bank account in which funds belonging to the LLC were held at any time from 2002 through the present including, but not limited to, Chase Account No. 000000902950187 and Citibank Account No. 9995797265;

6.   A copy of each and every document including, but not limited to, cancelled checks and wire or electronic transfer confirmations, evidencing a distribution by the LLC to Mr. Cozza;

7.   An electronic copy of the LLC's financial books and records from 2002 through the present;

8.   A copy of each and every agreement of sale executed for any real property owned by the LLC from 2002 through the present;

9.   A copy of the HUD-1 settlement statement from each and every sale or acquisition of real property by the LLC from 2002 through the present; and

10.   A copy of the rent roll from each and every real property owned by the LLC from 2002 through the present.

Please be advised that the LLC's failure to provide the requested documentation will result in Mr. Cozza pursuing all of his rights and remedies pursuant to the LLC's Operating Agreement and applicable law.

November 5, 2014
Page 3 of 3

Should you wish to discuss this matter, please do not hesitate to contact me.

Very truly yours,

ERIC C. MILBY

2. Article Number

717910001649256994487

1. Article Addressed to:

Kansas City Equities, LLC
CSC-Lawyers ncorporating Service Co
221 Bolivar
Jefferson City, MO 65101

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X ☐ Agent
☑ Addressee

B. Received by (Printed Name)    C. Date of Delivery
11-12-14

D. Is delivery address different from item 1? ☐ Yes
If YES enter delivery address below:    ☐ No

3. Service Type    ☒ Certified

4. Restricted Delivery? (Extra Fee)    ☐ Yes

PS Form 3811    Domestic Return Receipt

---

2. Article Number

717910001649256994425

1. Article Addressed to:

Nickolas W. Jekogian, III
Signature Group Investments
1430 Broadway, Suite 503
New York, NY 10018

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
11/10/14

D. Is delivery address different from item 1? ☐ Yes
If YES enter delivery address below:    ☐ No

3. Service Type    ☒ Certified

4. Restricted Delivery? (Extra Fee)    ☐ Yes

PS Form 3811    Domestic Return Receipt